A01A0349. IN THE INTEREST OF C. C., a child.
(547 SE2d 738)

RUFFIN, Judge.

The mother of C. C. appeals the juvenile court's order in which it found C. C. to be deprived and placed her in the temporary custody of the Department of Family & Children Services (DFACS). On appeal, the mother challenges the sufficiency of the evidence supporting the juvenile court's finding of deprivation. For reasons that follow, we reverse.

In reviewing a juvenile court's finding of deprivation, we view the evidence

> in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.[1]

So viewed, the evidence establishes that the mother was abused as a child and spent time in foster care. The mother testified that, as a result, she has "suffered from depression" her entire life. When the mother was 21, she was raped by an acquaintance and became pregnant with C. C., who was born on August 10, 1994.

In November 1997, the mother and C. C. moved to Georgia and began living with Mr. and Mrs. Skutka. While living with the Skutkas, the mother remained unemployed. During this time, the mother was preoccupied with her depression, and she became short-tempered with her daughter and would scream at her and spank her. Mrs. Skutka, concerned for C. C.'s safety, took over care of the child.

The mother's mental condition deteriorated, and she began having suicidal and homicidal ideations. According to the mother, she was diagnosed at one point as being bipolar and having a "borderline personality." In August 1998, the Skutkas became C. C.'s legal guardians. Around the same time, the mother had herself admitted to

---

[1] (Punctuation omitted.) *In the Interest of B. M. B.*, 241 Ga. App. 609 (527 SE2d 250) (1999).

Northside Hospital where she remained for two weeks. When her stay at Northside expired, she was transferred to Georgia Regional Hospital for an additional five days. From Georgia Regional Hospital, the mother went immediately to a crisis stabilization unit located at another facility. According to the mother, she was then "dumped" into a shelter for a week and a half before voluntarily checking herself into Ridgeview Institute, a psychiatric hospital, for five weeks.

Apparently, the treatment in Georgia was ineffective because, in December 1998, the mother left for Bowling Green, Florida. For over seven months, the mother stayed at Caring People Ministries, a recovery center for women. After leaving this center, the mother stayed at a series of shelters and motels. Several days before the deprivation hearing, the mother moved back in with the Skutkas.

While C. C. was staying with the Skutkas, the mother provided no financial support. Although she was unable to see her daughter for a year, she was able to call her once a week. According to the mother, she spoke with C. C. "[m]aybe once or twice a month at the most."

In the summer of 1999, C. C. began meeting regularly with counselor Janice Turber. The purpose of therapy was to "help the Skutkas and [C. C.] make a determination [of] what would be in the best interest as far as long-term care . . . for [C. C.] and assist her in handling and adjusting to her mother's long-term absence." During the counseling sessions, C. C. said that her mother had hit her. In addition, Turber testified that, at the mention of her mother's name, C. C. "would back into the corner of the sofa where she was sitting, her eyes would become wild and wide, and the head would drop and the breathing would increase."

In October 1999, Mrs. Skutka fell and broke her wrist. At approximately the same time, C. C. contracted head lice. According to Mrs. Skutka, "head lice require a lot of hands-on stripping of eggs off of hair shafts, which is a very tedious process." Because of her broken wrist, Mrs. Skutka was unable to perform this task, and she contacted DFACS seeking "respite care until such time as [her] wrist and arm would be healed up [sic] enough for me to resume taking care of" C. C. The Skutkas then turned the child over to DFACS.

On November 5, 1999, DFACS filed a deprivation petition. When the mother learned of the deprivation proceedings, she left an assisted living facility in Florida and returned to Georgia. The mother had two visits with C. C. that were supervised by Turber. Turber testified that the visits went "very well," and she recommended that the mother continue visiting C. C.

At the hearing, the mother admitted that she was unable to provide for C. C. on her own, but she asserted that, with the Skutkas' help, she would be able to care for her daughter. According to the

mother, her mental health is no longer a stumbling block. Upon returning to Georgia, the mother obtained a job, which she had held for six weeks prior to the hearing. She takes Paxil and Depakote for her mental health problems, and she has continued to see a therapist. Mrs. Skutka testified that she has seen definite improvement in the mother since her return from Florida in that the mother no longer becomes weepy or loses her temper.

Mrs. Skutka indicated that, at the time of the hearing, she was both willing and able to care for C. C. However, she acknowledged that she had been disabled from work since 1989 as a result of fibromyalgia, asthma, chronic fatigue syndrome, and pernicious anemia. Because of her medical problems, Mrs. Skutka had been hospitalized for three days while C. C. was still in her care. During this time, friends had taken care of the child. According to Mrs. Skutka, with the exception of those three days, C. C. had not been separated from her. Mrs. Skutka testified that "[e]ven when we go on vacation, which we go visit my family, we take [C. C.] with us wherever we go. She is just like another grandchild. She's real close to my grandkids, and she goes along wherever we go." On February 25, 2000, the juvenile court issued its order finding that C. C. was deprived. With respect to the Skutkas, the court found that Mrs. Skutka "has numerous health problems which make it unrealistic for the child to be placed in the temporary custody of the Skutkas as requested by the mother."

Pursuant to OCGA § 15-11-2 (8) (A), a deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [her] physical, mental, or emotional health or morals."[2] This definition "focuses upon the needs of the child regardless of parental fault. The [deprivation] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[3] Deprivation must be shown by clear and convincing evidence.[4] That standard was not met here.

Although the mother has a lengthy history of mental health problems, she has sought treatment for her condition. Moreover, the mother, remarkably, ensured that her child received proper care while she obtained treatment. She did so by placing her child with the Skutkas, who clearly are caring, capable people. The only time the Skutkas were unable to care for C. C. was when Mrs. Skutka had

---

[2] Under OCGA § 15-11-2 (8), deprivation may also be shown by establishing that a child has been illegally placed for care or adoption; has been abandoned; or is without a parent, guardian or custodian. These bases are not at issue, and we do not address them.

[3] (Punctuation omitted.) *In the Interest of D. E. K.*, 236 Ga. App. 574, 577 (512 SE2d 690) (1999).

[4] Id.

a broken wrist. There simply is no support in the record for the trial court's conclusion that Mrs. Skutka's additional medical ailments are an impediment to her caring for the child.

In its brief, DFACS asserts that the Skutkas' ability to care for the child is immaterial because a "finding of deprivation is based on an absence of proper *parental* care or control." In this case, however, the mother exercised her parental control by placing her child with competent caregivers while she received mental health treatment. While it is true that the fact "[t]hat someone else is providing good care in the absence of the parent in question does not preclude a finding of deprivation,"[5] it is equally true that the mere fact that a child is being cared for by someone other than a parent does not prove a lack of parental fitness.[6] Here, the mother exercised good parental judgment in temporarily placing her child with the Skutkas. And, while in the Skutkas' care, all of C. C.'s physical, mental, and emotional needs were met. Accordingly, in view of Mrs. Skutka's testimony that she was willing and able to continue caring for C. C., the trial court erred in concluding that C. C. was deprived.[7]

*Judgment reversed. Johnson, P. J., and Ellington, J., concur.*

DECIDED APRIL 11, 2001.

*Elena M. Mushkin, Eric G. Kocher*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Edwards, Friedewald & Grayson, Robert J. Grayson, Sanders B. Deen*, for appellee.

---

[5] *In the Interest of M. C. J.*, 242 Ga. App. 852, 855 (1) (531 SE2d 404) (2000).
[6] *In the Interest of A. G. I.*, 246 Ga. App. 85, 88 (2) (c) (539 SE2d 584) (2000).
[7] See *In the Interest of D. E. K.*, supra.