A02A0895. In the Interest of C. C., a child.
(571 SE2d 537)

Pope, Senior Appellate Judge.
S. J. C., the mother of C. C., appeals the termination of her parental rights. In two separate opinions, we have already reversed a finding of deprivation based on evidence presented at a hearing held on February 16, 2000, *In the Interest of C. C.*, 249 Ga. App. 101 (547 SE2d 738) (2001) ("*C. C. I*"), and a subsequent finding of termination based on that deprivation order, *In the Interest of C. C.*, 252 Ga. App. 98 (555 SE2d 762) (2001) ("*C. C. II*"). The trial court has now entered another termination order, but this time based on evidence of deprivation presented at a second hearing, held on August 30 and 31,

2000. The primary issue on appeal is whether the State presented sufficient evidence at the August hearing to sustain the termination order. We hold that although several witnesses presented testimony about S. J. C. and her child, much of the testimony was flawed, weak, or seriously contested, and therefore the decision below must be reversed.

The facts developed at the first hearing are set forth in *C. C. I.* For the purpose of background, they are summarized here. C. C. was born in 1994. In November 1997, the mother and child moved to Georgia and began living with friends, Mr. and Mrs. Skutka. During this time, S. J. C. was underemployed and had increasing mental health problems. Eventually, Mrs. Skutka, concerned for C. C.'s safety, took over care of the child. In August 1998, S. J. C. sought mental health treatment in Georgia for several months. In December she was admitted to an eight-month, mental health program in Florida. In order to go, she gave temporary custody of C. C. to the Skutkas, who agreed to care for the child and became the child's temporary guardians. S. J. C. maintained contact with her child between two and four times a month. While in Florida, she attempted suicide. She testified that she had been diagnosed as "bipolar with borderline personality."

In the summer of 1999, C. C. began regular meetings with a counselor named Janice Turber to assist her in dealing with her mother's lengthy absence and to assess long-term care options. In October, the child contracted lice, and Mrs. Skutka fell and broke her wrist at the same time, which prevented her from giving C. C. proper care for the lice. Ms. Skutka sought Turber's advice about how to proceed, and the counselor notified the Cobb County Department of Family & Children Services, which led to the child being placed in foster care. About two weeks later, DFACS filed a deprivation petition, whereupon S. J. C. returned to Georgia. She eventually resumed living with the Skutkas, continued her mental health treatment including medication, obtained a job, and began supervised visits with C. C.

Three months later, in February 2000, the Juvenile Court of Cobb County held a hearing on deprivation. The trial court held that the child was deprived, finding that S. J. C. was unable to provide a stable living environment, did not contribute to the child's financial support, and failed to maintain a meaningful and supportive parental bond with the child. The court also found that Ms. Skutka had numerous health problems that made it unrealistic for the child to be placed in her home. S. J. C. appealed.

On appeal, we found that the evidence presented at the deprivation hearing showed that although the mother had a lengthy history of mental health problems, she had sought treatment; and, "remark-

ably," by placing the child with the Skutkas, she ensured that her child received proper care while she received treatment. *C. C. I*, 249 Ga. App. at 103-104.We also held that there was no evidence that Mrs. Skutka's medical ailments were an impediment to her continued ability to care for the child. Id. at 104. We added that the mere fact that the child was being cared for by someone other than a parent "does not prove a lack of parental fitness." Id. Finally, the evidence showed that "while in the Skutkas' care, all of C. C.'s physical, mental, and emotional needs were met." Id. Therefore, we held that the trial court erred by concluding the child was deprived. Id.

Meanwhile, four days after the deprivation order, and long before the appeal from that order was docketed in this Court, DFACS petitioned for termination. The juvenile court held an evidentiary hearing on August 30 and 31, 2000, after which it terminated the rights of both parents. In the second appeal, we vacated the termination order because the juvenile court clearly relied on the earlier deprivation order and remanded the case for the court to enter findings of fact, conclusions of law, and a new judgment based on all the evidence. *C. C. II*, 252 Ga. App. at 99.

S. J. C. now appeals the termination order entered following remand. Essentially, she asserts that no new evidence was introduced at the second hearing sufficient to support deprivation or termination. She also alleges that the trial court made factual findings that are not supported by the evidence.

In addition to the evidence presented at the deprivation hearing, DFACS presented the following evidence at the termination hearing.

As early as age 14, S. J. C. engaged in self-mutilation because of depression.

In addition to the testimony that she gave at the first hearing, Turber testified that she evaluated C. C. in February 1999, when the child was only four and one-half years old, and found that the child had some academic and developmental delays and anxiety. C. C. felt loss, fear of loneliness, rejection, transience, and parent-child role reversal. The child gave some indications of neurological problems and suffers from an inability to remember things. She expressed concerns about never wanting to see her mother again. She looked terrified when asked whether she had heard from her mother and said that she did not want to be around the "mean mommy." During 2000, Turber continued to work with the child and also supervised visits between the child and S. J. C. On May 18, 2000, the child expressed feeling responsible for S. J. C.'s moods. She behaved differently when S. J. C. was not present. She was much more childlike and playful and had normal speech, whereas, with the mother present, she regressed, sounded like a much younger child, and made statements like "I need to get a job so my mommy can get a house." However,

most of the meetings between the mother and child went well. Finally, Turber testified that compared to when she first began seeing C. C., the child had improved significantly. She was more relaxed and more self-assured and had less anxiety. Turber attributed the changes to a stable foster home environment.

Turber testified that a child can suffer from being exposed to a parent with a mental dysfunction, especially one involving self-mutilation, attempted suicide, and homicidal ideations. The problem is made worse when the parent refuses to take prescribed medication. If the parent were to act on any of those violent urges, the child would be traumatized. Turber had also witnessed the mother at a citizens review panel. Turber felt that the mother's explanation that she quit her job before obtaining another one because of the stress of commuting by bus was telling because raising a child is more stressful than commuting. She also observed that S. J. C. was unable to control her emotions during the panel meetings unlike other parents she had observed in the same setting; S. J. C. became very angry, spoke disrespectfully, cried, and left the room at times.

Turber was also a counselor for the Skutkas. She testified that she has concerns about C. C. being placed in their home because of Mrs. Skutka's ongoing medical problems. She also testified that C. C. loves the Skutkas and is more bonded to them than to anybody else. Turber recommended continued contact between C. C. and the Skutkas. She had no concern that the Skutkas would abuse or harm C. C. in any manner. The Skutkas appeared to be meeting C. C.'s needs. The child had bonded, but to a lesser degree, with the foster parents.

In March 2000, S. J. C. apparently met with a psychiatrist named Dr. Friedman, but Friedman did not testify and his file was not introduced into the record. She apparently missed an earlier appointment set for February 24. S. J. C. testified that Dr. Friedman prescribed Paxil. On May 30, 2000, she sought the care of Dr. Anthony Ekwenchi, a psychiatrist, because she had run out of her medication, Depakote and Paxil, that had been prescribed by other doctors. Dr. Ekwenchi saw S. J. C. for about 25 minutes and based on an understanding that Dr. Friedman had diagnosed her as having a bipolar disorder, he prescribed the same medications because he felt that she still needed them. S. J. C. had indicated to Ekwenchi that she had attempted suicide on several occasions.

Dr. Ekwenchi testified that the Depakote prescription was important because it controls a bipolar patient's mood and if the patient does not take the medication, the illness returns. However, he never explained what the illness was or how it could affect the parent-child relationship. He told S. J. C. to return in one month to renew the prescriptions, but she never did. He also scheduled related

blood work for her, but she did not follow through. Dr. Ekwenchi explained that because of "poor insight into their illness, some people do get off the medication. But when they do, . . . they will relapse and then either the police will take them to the emergency room or they can do something that would end up being dangerous to them or to other people — for instance, you know, suicide." The doctor said, "once bipolar, always bipolar unless maybe the person is still taking the medications, in which case you don't see the cardinal symptoms."

On cross-examination, Dr. Ekwenchi stated that although he performed his own psychiatric assessment during those 25 minutes, he did not diagnose S. J. C.; rather, he was relying on Dr. Friedman's diagnosis, with whom he had not spoken. But Dr. Ekwenchi's records did not show whether Dr. Friedman had performed several tests on S. J. C., some of which are necessary to diagnose her as bipolar. Dr. Ekwenchi also testified that it takes "four, five, six visits — in order to be able to conclusively tell that this patient has [a personality] disorder." He testified that he must meet with a patient five to six times for at least 25 to 30 minutes each and corroborate the information with the patient's family or friends in order to diagnose someone with having a bipolar disorder. But, he testified, each patient is different and some require less meetings, and each psychiatrist is different and some can diagnose in one or two meetings. Finally, Ekwenchi admitted that the information contained in Dr. Friedman's notes was barely sufficient to support a diagnosis of bipolar.

S. J. C. testified that she was still under Dr. Ekwenchi's care at the time of the hearing even though she had only seen him once and did not have an appointment. She claimed she was told that she could not get a second appointment with Dr. Ekwenchi for six months after the first.

Erica Durham, a foster care case manager for DFACS, testified that she worked with S. J. C. on accomplishing the goals of a reunification case plan. Durham testified that S. J. C. did not accomplish the goals of the plan. Specifically, she failed to continue free mental health counseling with Ann Clark because she wanted a "Christian counselor." She discontinued sessions with Dr. Jeff Pipe after May 2000, failed to take her medications, and failed to manage her mental health needs on an ongoing basis. Durham admitted that S. J. C. accomplished some of the case plan goals. She had paid her child support, submitted to drug testing, and contacted a therapist on her own.

Amy Schwartz, a DFACS social services case manager, testified that S. J. C. had inadequate housing and unstable employment, failed to maintain a lengthy relationship with any one counselor or psychiatrist, was not addressing her mental health issues, and did not believe that she had any mental health problems. Accordingly,

she had concerns about C. C.'s safety if she was returned to her mother. She also testified that the Skutkas' stepchild had alleged that her stepparents had abused her physically and sexually. Consequently the agency told S. J. C. not to live with the Skutkas, but she has not complied with that request. However, Schwartz had no personal knowledge of the allegations and had never visited the Skutka home. Finally, Schwartz testified that the child was in foster care and that, in her opinion, the child could be harmed by prolonged exposure to foster care.

On cross-examination, Schwartz admitted that she is the "termination caseworker" and does not attempt to reunite the family; that she had only spoken with S. J. C. one time; that she based her opinion on the fact that S. J. C. was not a part of her child's life while she was in Florida; that she had never visited S. J. C. at her job, never spoken with S. J. C. about her employment, and never contacted any of S. J. C.'s employers; and that she had never spoken with any of S. J. C.'s doctors, reviewed the medical records, nor talked to S. J. C. about her mental health history.

From January to May, S. J. C. worked at Office Depot but quit because she did not like the commute. She was employed at Garden Botanika at the time of the termination hearing, having started training the day before the hearing. She testified that for part of the time between May and August, she was not working because she had broken her foot. A DFACS worker corroborated that she had injured her foot but understood that S. J. C. quit her job before the injury. Prior to the hearing, she had not worked full time for a period of more than six months for the same employer since April 1996. The last time she had an independent residence was from 1995 to 1997, but she had been evicted from that residence. She has not been able to establish an independent residence in accordance with the case plan because she cannot afford it. She does not have any property or bank accounts. But she paid child support of $80 per month in June and July 2000 in accordance with a court order.

S. J. C. testified that the doctors that she had seen were not concerned about her medical condition. She did not think that any doctor had taken sufficient time with her to develop a correct diagnosis. She testified that Ekwenchi never diagnosed her as being bipolar. She does not believe that she is bipolar or still suffering from any disorder or depression. However, she was seeing Dr. Pipe, a therapist, at the time of the hearing; the parties stipulated that S. J. C. saw Dr. Pipe four times in April and three times in August. She testified that she missed three months because she was not working and could not afford it. S. J. C. admitted she stopped taking Depakote in June because, she claimed, she could not afford it and it did not help her; she was still taking Paxil. Finally, she was less than candid at all

times at the hearing. For instance, she claimed that she completed an in-patient program at Caring People Ministries in Florida but later admitted that she had been asked to leave.

> Georgia law requires a court to conduct a two-step analysis to determine whether a parent's rights to his or her child should be terminated. First, a court must determine whether the state has met its burden of presenting clear and convincing evidence of parental misconduct or inability. Second, if the court finds such evidence, it must then determine whether termination of parental rights is in the best interest of the child. To satisfy the first part of this inquiry, the evidence must establish that (i) the child is deprived, (ii) the parent's lack of proper parental care or control is causing the deprivation, (iii) this cause is likely to continue or will not be remedied, and (iv) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

(Punctuation and footnotes omitted.) *In the Interest of B. N. A.*, 248 Ga. App. 406, 409-410 (1) (546 SE2d 819) (2001). The court must also consider a "medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94 (b) (4) (B) (i). And in a case of this type, where the child is not in the parent's custody, the court must also consider whether the parent *"without justifiable cause has failed significantly* for a period of one year or longer prior to the filing of the petition for termination of parental rights," to maintain a meaningful bond with the child, to provide care and support required by law or decree, and to comply with a reunification plan. (Emphasis supplied.) OCGA § 15-11-94 (b) (4) (C).

Finally, the standard of review is well known.

> In determining whether a termination of parental rights is supported by sufficient evidence, we construe [the] evidence and all reasonable inferences from it in a light most favorable to the trial court's ruling and ask whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost.

(Citation omitted.) *In the Interest of J. E. L.*, 223 Ga. App. 269 (1) (477 SE2d 412) (1996).

This Court has already determined that the evidence presented at the deprivation hearing does not constitute clear and convincing

evidence of deprivation. *C. C. I*, 249 Ga. App. at 104. Thus, unless DFACS presented additional evidence of deprivation at the termination hearing a finding of deprivation cannot be supported.

DFACS's primary argument is that S. J. C. had serious, ongoing, untreated mental health problems about which she was in denial that affected her parenting abilities. DFACS tried to show that she had been diagnosed as bipolar but failed. Dr. Friedman, the doctor who allegedly made the diagnosis, did not testify and was not available for cross-examination. Any evidence of his diagnosis was therefore inadmissible to prove the point. See *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001). Furthermore, DFACS failed to present evidence describing what being bipolar means or how it might affect S. J. C.'s parenting abilities. Id. Even if the diagnosis had been made, Dr. Ekwenchi only talked in terms of "the illness" returning if proper medication was not taken. He did refer to suicide but did not explain the relationship between a diagnosis of bipolar and suicide. Merely eliciting the word bipolar does not provide clear and convincing evidence of a condition that renders a person incapable of parenting. On cross-examination, Ekwenchi admitted that he did not diagnose the patient himself, and his testimony seriously undermined the diagnosis of Dr. Friedman, upon whom he relied. DFACS also failed to present medical testimony regarding any of S. J. C.'s treatment in Florida. Although Turber testified that a child can suffer from exposure to a parent with a serious mental dysfunction, that testimony has little relevancy without solid evidence that S. J. C. had such a condition and that the condition was likely to continue.

In short, DFACS failed to present clear and convincing evidence of a medically verifiable deficiency in the mother's mental condition that would affect her parenting. See *In the Interest of C. D. E.*, 248 Ga. App. at 756, 764-767 (2). The mother's own testimony, although troubling, simply does not include the detail necessary to make conclusions about her mental condition, its effect on her parenting skills, or the likelihood that it will continue. Although she clearly has mental problems, the record does not contain sufficient evidence to show the nature of her problems and the prognosis for her future.

DFACS also argued that S. J. C. failed to carry out her responsibilities under the reunification plan. But the actual case plan was never introduced into evidence. Durham, the only reunification case manager who testified, said that in connection with the plan she "worked with" S. J. C. on her mental health issues, on caring for the child, and on obtaining stable housing and a steady income. But she did not articulate the definitive goals of the plan except to say that with regard to mental health issues, S. J. C. was required to "handle them on an ongoing basis." On mental health issues, Durham noted

that S. J. C. had not followed through with Clark because she wanted a Christian counselor. But, S. J. C. initiated the contact with Clark and sought out another named Dr. Pipe to replace her. Durham testified that S. J. C. failed to continue with Dr. Pipe. But the parties stipulated that S. J. C. saw Dr. Pipe four times in April and three times in August; she also paid for those visits herself. Durham testified that S. J. C. had not taken her medications, but no details were given to identify the medications, the prescribed dosages, the degree to which S. J. C. had not complied, or the effect. Durham testified that S. J. C. had failed to handle her mental health needs on an ongoing basis, but she failed to give any evidence that S. J. C. had failed to follow a counselor's or a doctor's specific advice. She apparently personally concluded that S. J. C. had not seen a counselor or doctor enough, but without support for that opinion, it adds little to DFACS's case.

Durham also admitted that S. J. C. had accomplished some of the goals of the plan, namely, she obtained a job for five of the eight months between her return to Georgia and the termination hearing. S. J. C. had paid the required child support, and she sought therapists on her own. She had submitted to a substance abuse assessment as required by the plan. And it was DFACS that failed to follow through on the required neurological exam for the child despite a court order to do so. Finally, although Schwartz also testified that S. J. C. failed to follow the reunification case plan, as shown above, her testimony was largely flawed by a lack of personal knowledge.

DFACS also argued that S. J. C. was unable to maintain a stable residence or job and thus was unable to provide a safe and permanent home and support for C. C. But she was living with her friends the Skutkas and had been for seven months prior to the hearing. DFACS argued that because neither Mr. nor Mrs. Skutka testified at the termination hearing, S. J. C. had failed to show that they were still available caretakers for the child. But DFACS had the burden of proof to show that the mother's proposed living arrangements were unavailable. *In the Interest of B. N. A.*, 248 Ga. App. at 409. This they did not do. Finally, we have already held that S. J. C. "exercised good parental judgment in temporarily placing her child with the Skutkas," and that "while in the Skutkas' care, all of C. C.'s physical, mental, emotional, and moral needs were met" while S. J. C. obtained the help she needed to be a better parent. *C. C. I*, 249 Ga. App. at 104.

DFACS also argued that S. J. C. refused to follow its advice about living with the Skutkas. Durham testified that she told S. J. C. not to live with the Skutkas but that she did so anyway. But the court sustained an objection to Durham's testimony about the reason DFACS did not want S. J. C. living there. And although DFACS introduced a document showing that in August 1995, a court found that the Skutkas' 15-year-old child had been deprived, no details were given

and no other evidence was introduced to show the impact of that fact on the Skutkas' ability to help S. J. C. and C. C.

DFACS also argued that the child had suffered because of her mother's mental condition and inability to maintain steady housing and employment. But, although Turber testified that the child was experiencing certain psychological problems, she did not connect those problems with S. J. C.'s mental condition or distinguish them from the effect caused by S. J. C.'s absence while in Florida. Meanwhile, there was no evidence that the mother did not regularly visit with the child and try to maintain a relationship with the child.

In summary, much of the evidence presented by DFACS is flawed, weak, or seriously contested. It is obvious that S. J. C. has mental problems, but the true scope and future prognosis are unclear. Yes, she admitted failing to take one of two medications, but there is no clear and convincing evidence that she has been diagnosed as being bipolar or that the nature of her mental condition means that she is unable to parent a child. She did not see a counselor every month for the eight months between her return from Florida and the termination hearing, but no counselor or doctor testified that she was required to do so. She does not have her own housing, but she has friends willing to have her and her child live in their home. The testimony is that the child received proper care at the Skutkas and was not deprived while she lived there. The fact that the Skutkas could not care for the child's lice and the counselor's call to DFACS are the events that sent the child to foster care. S. J. C. has been trying since that time to regain custody.

Accordingly, we find that DFACS failed to present clear and convincing evidence that the child was deprived or that the mother was the cause of any deprivation such that a rational trier of fact could find that the parent's rights have been lost.

This is a close case. If the standard of proof was the preponderance of the evidence, we would affirm. But the standard in a termination case is clear and convincing evidence. It could well be that clear and convincing evidence was available, but in our opinion it was not presented to the court.

*Judgment reversed. Ruffin, P. J., concurs. Barnes, J., concurs in judgment only.*

DECIDED SEPTEMBER 23, 2002 —

*Elena M. Mushkin*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General,*

*Shalen S. Nelson, Assistant Attorney General, Sanders B. Deen, Catherine C. Vandenberg*, for appellee.