608 S.E.2d 43 (2004)
270 Ga. App. 700
In the Interest of T.P., a child.
No. A04A1322.
Court of Appeals of Georgia.
December 1, 2004.
*45 Green Moore, Gray, for Appellant.
Thomas O'Donnell, Milledgeville, Thurbert Baker, Attorney General, Shalen Nelson, Senior Assistant Attorney General, William Joy, Senior Assistant Attorney General, Laura Hyman, Assistant Attorney General, for Appellee.
ADAMS, Judge.
The mother of T.P. appeals from the juvenile court's order terminating her parental rights. She argues that the evidence was insufficient to sustain the juvenile court's findings of fact. Because we find that the state failed to present clear and convincing evidence that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child, we reverse.
On appeal from an order terminating parental rights, this Court reviews the evidence in the light most favorable to the juvenile court's disposition to determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. In making this review, we neither weigh the evidence nor determine the credibility of witnesses, but instead defer to the juvenile court's factfinding and affirm unless the appellate standard is not met. In the Interest of J.G.J.P, 268 Ga.App. 614, 602 S.E.2d 320 (2004).
The Department of Family and Children Services opened a child protective services file on T.P. in February, 1999, to investigate whether the child was living under unsanitary conditions and was inadequately supervised. DFACS prepared a case plan and monitored the child's living conditions. The child came into DFACS's custody on May 24, 2000, after a neighbor anonymously reported that he was playing unsupervised near the road and was almost struck by a car. He was five years old at the time.
DFACS filed a deprivation petition on May 25, 2000, and the juvenile court postponed the hearing on the petition to allow the mother to undergo a psychological evaluation. In the interim, on June 23, 2000, DFACS developed a reunification case plan with the mother that required her to (1) cooperate with DFACS; (2) maintain a bond with T.P. through visitations; (3) demonstrate age-appropriate parenting skills, which included completing parenting classes and obtaining a psychological evaluation; (4) maintain a safe and clean home; and (5) resolve her mental health issues, which included making appointments with Oconee Mental Health Services' Beginning Points program and with a physician, and following their recommendations. The hearing on the deprivation petition was held on August 3, 2000, and the juvenile court signed the order of deprivation, incorporating the case plan and awarding temporary legal custody of the child to DFACS. Over the next two years, the mother was ordered to comply with additional case plans containing the same reunification goals.
DFACS filed a petition to terminate the mother's parental rights on March 5, 2002, based upon noncompliance with the case plans.[1] The evidence at the termination *46 hearing showed that the mother left high school in the eleventh grade. She said that she received Social Security income ("SSI") for a learning disability. At some point after high school, the mother lived in a group home in Albany, before moving to a "supervised living" situation, where she met T.P.'s father. They were married in 1991; T.P. was born in 1994; and the couple separated in 1997. The mother had not initiated divorce proceedings because she could not afford Legal Aid's $300 fee.
The mother testified at the hearing that she was unemployed and received about $500 per month in SSI benefits. She paid $300 in rent on her current home and relied on food stamps to buy her food. Every month she cashed her SSI check and turned the proceeds over to her landlord, who would help her pay bills. She does not have a driver's license and depends upon friends and family for her transportation. She said that she was taking medication for depression, which she believed stabilized her condition.
The juvenile court admitted into evidence a psychological evaluation of the mother performed by Dr. Michael P. Rose in May 2000. The report reflects Dr. Rose's conclusion that the mother was capable of providing adequate care for herself and her son in a supervised independent living arrangement. He recommended that the mother be given custody of the child as long as they were supervised and lived with the mother's aunt. He also indicated that this arrangement should be reassessed within six months to one year to determine the success of the mother's treatment for depression and her follow-through with court orders. The evidence showed, however, that the mother refused to live with her aunt even though DFACS had approved placement in the aunt's home.
While the mother was aware of Dr. Rose's opinion that she could not care for T.P. on her own and acknowledged that she needed help with some aspects of her life, she denied that she needed help parenting T.P. She said that she had taken care of T.P. alone for two years and with her husband for the three years prior to that. She said she always made sure that T.P. had a bath, that he had on clean clothes, that he went to church twice per week and that he went to school. She also volunteered at her son's preschool and won an award for doing so.
The mother acknowledged that the house she shared with T.P. at the time he was taken into custody was in poor condition, with a lot of clutter. She had moved to a new trailer several months before the hearing and said that her current home was much neater, with the dishes put away and the laundry folded. T.P.'s court-appointed special advocate ("CASA") had tried to visit the mother's new home on at least two occasions before the hearing to assess its condition, but the mother did not return the CASA's telephone calls until the day before the hearing. At that time, the mother was already in another town to attend the hearing and could not make her home available for the CASA's visit. When the CASA visited the mother's prior residence five months before the termination hearing, however, she found the house cluttered, with dirty dishes and dead roaches in the sink and on the counters. In addition, the house was cold and there was no running water because the utilities had been disconnected.
The mother acknowledged that the landlord at that residence had filed a dispossessory warrant against her for failure to pay rent. The mother said that she quit paying her rent because the landlord refused to repair a leak, and her water bill had gotten so high she could not pay the bill. The mother's current landlord testified that when the mother's water was disconnected at her former residence, the mother used her rent money to pay the water bill.
The state presented the testimony of the DFACS special services case manager who worked with the mother before T.P. was taken into custody. She testified that the mother was not meeting her case plan goals at the time. She said that the mother was not keeping her house clean and was not properly supervising the child, which led to the incident with the car. The case manager said that she talked with the mother about *47 the incident, but the mother did not appear to understand the importance of watching the child when he was outside. Instead, the mother became upset and resolved that the child could not go outside anymore.
The DFACS case manager who handled T.P.'s case after the child was taken into custody testified that the mother had cooperated with the department and maintained contact with T.P. as required by her case plans, but had failed to comply with her other case plan goals. She said that the mother had not demonstrated age-appropriate parenting skills during her visits with T.P., citing one example where she lost patience while helping T.P. with his homework. The mother shoved the homework at the child and told him to do it himself. She said that the mother had been uncooperative in accepting help with her parenting skills, noting that she had refused to accept the recommendation that she live with her aunt despite the fact that DFACS was prepared to approve the child's placement in the aunt's home.
In addition, the case manager said that the mother had not met the goal of resolving her mental health issues. The mother attended only one appointment with the Oconee Mental Health Services, but did not make any follow-up appointments. And although the mother had sought medication for her depression, because the mother failed to follow up on her appointments with Oconee Mental Health Services, there was no indication that her depression or other mental health issues were resolved or under control.
The case manager further testified that T.P. had lived in the same foster care home since he was removed from his mother's custody. She said his behavior had improved tremendously, as had his grades. The child is involved in various extracurricular activities, such as swimming. DFACS believed that T.P. needs permanency, which his foster parents provided.
His foster father testified that T.P. was doing well in school and was one of the top readers in his class in first grade. In addition to swimming, the child plays baseball and soccer and attends Sunday school. The foster father said that they had two boys of their own and that they wanted to adopt T.P.
Based upon the evidence, T.P.'s guardian ad litem recommended termination of the mother's parental rights. The trial court signed the order terminating the mother's parental rights on October 7, 2002.
Georgia law requires that courts follow a two-step analysis in determining whether to terminate parental rights. "First, the court determines whether there is clear and convincing evidence of parental misconduct or that the parent is unable to care for and control the child. Second, the court determines whether termination is in the best interest of the child." (Citation omitted.) In the Interest of S.H.P., 243 Ga.App. 720, 534 S.E.2d 161 (2000). A finding of parental misconduct requires clear and convincing evidence of the following four factors:
(1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.
(Footnote omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 735-736(3), 534 S.E.2d 452 (2000).
1. Because the mother did not appeal the juvenile court's orders finding that the child was deprived, she is bound by that determination. In the Interest of B.L.S., 239 Ga.App. 771, 774, 521 S.E.2d 906 (1999).
2. In addition, the deprivation order found that the child was deprived "in that he was without proper parental care or control necessary for his physical, mental, or emotional health." The mother's failure to appeal the deprivation order also renders the juvenile court's determination on this second factor binding. In the Interest of A.G., 253 Ga.App. 88, 89(1)(b), 558 S.E.2d 62 (2001); In the Interest of R.G., 249 Ga.App. 91, 93(1)(a), 547 S.E.2d 729 (2001).
Moreover, the evidence at the hearing supported this finding. Prior to the child's removal from her home, the case manager testified that the mother was unable to meet *48 her case plan goals of keeping her house clean or supervising the child. The state entered photographs showing the cluttered and unclean state of her home at the time of T.P.'s removal, and the mother admitted that she had problems keeping her house clean at the time. Moreover, the evidence showed that the mother was not providing proper supervision. Although her house was close to the road, she did not believe that she needed to be outside supervising her five-year-old son as he played.
3. In addition, there was clear and convincing evidence that the cause of this deprivation was likely to continue. The state sought to terminate the mother's parental rights on the ground that she had failed to comply with her court-ordered case plans. OCGA § 15-11-94(b)(4)(C)(iii). The evidence at the hearing showed that the mother had complied with certain aspects of her case plans. The case manager testified that the mother had been cooperative with DFACS and had maintained a bond with her child, visiting with him every chance she got. Indeed, her visitations were decreased from twice per month to once per month only because DFACS did not have the personnel to facilitate those visitations.
But the mother had failed to comply with other requirements of the plan. The case manager testified that the mother had failed to meet her goal that she exhibit age-appropriate parenting skills. And although the case manager gave only one specific example of the mother's inappropriate parenting skills, the evidence showed that the mother denied that she needed any assistance with her parenting skills and resisted DFACS efforts to provide such assistance. The mother took one parenting class through DFACS after her son was taken into custody, although her case plans required her to attend parenting classes on a regular basis. But most significantly, the mother refused to move in with her aunt and accept supervision of her parenting, even though this arrangement would have allowed her to live with T.P. The mother said that she refused this arrangement because at the time she did not feel like she needed supervision or maybe just did not want to admit that she needed help. Her testimony at the hearing indicated that she continued to believe that she did not need any help with her parenting skills.
There was also clear and convincing evidence that the mother had failed to maintain a safe and clean home. Five months before the termination hearing, the CASA visited the mother's home and she found it to be cluttered, with dirty dishes and dead roaches in the sink and on the counters. The heat and water had been disconnected due to the mother's failure to pay the bills. The mother and her landlord testified that she was now paying her bills and the mother said that she was now keeping her home clean.
The evidence showed, however, that the mother needed assistance in paying her bills and governing her finances. The test in determining termination of parental rights is whether the mother, "ultimately standing alone," is capable of mastering and utilizing the necessary skills to meet her parenting obligations. In re S.R.J., 176 Ga.App. 685, 686, 337 S.E.2d 444 (1985). See also In the Interest of A.S.H., 239 Ga.App. 565, 570(1), 521 S.E.2d 604 (1999). And although DFACS had not been to the mother's current home during the three months or so that she had been living there, the evidence showed that this omission was due, at least in part, to the mother's failure to return the CASA's telephone calls to schedule a visit. Under these circumstances, it was for the juvenile court to determine the weight to give the mother's claim that her housekeeping skills had improved. "In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Punctuation and footnote omitted.) In the Interest of A.T.H., 248 Ga.App. 570, 573(1), 547 S.E.2d 299 (2001).
The evidence also demonstrated that the mother had failed to meet her goal of attending counseling sessions to address her mental health issues. We note that the state failed to present competent, professional evidence of any diagnosis of the mother's mental condition. Dr. Rose was not present at the hearing to testify; therefore, any evidence of his diagnosis was inadmissible. In the Interest of C.C., 257 Ga.App. 543, 550, 571 S.E.2d *49 537 (2002). But the state was not seeking termination of the mother's parental rights on the ground that she had a medically verifiable mental deficiency in her mental health of such duration or nature as to render her unable to provide for her child. OCGA § 15-11-94(b)(4)(B)(i). Compare In the Interest of C.C., 257 Ga.App. at 550, 571 S.E.2d 537; In the Interest of A.W., 249 Ga.App. 278, 279-280, 547 S.E.2d 797 (2001). Rather, the state was seeking to terminate the mother's parental rights based upon her failure to comply with the court-ordered case plans.
Although there was no professional testimony, there was evidence that the mother had issues involving her mental health that required further evaluation. The mother testified that she was receiving SSI due to a learning disability and that she was taking medication for depression. Other witnesses testified that the mother was "slow" and needed to have things explained to her very carefully. And the case plan required that she participate in counseling to address these issues. But the mother attended only one such counseling session and failed to follow up with other sessions, as the case plans required. The case manager testified that this failure made it difficult to determine whether her mental health issues had been resolved. Thus, there was clear and convincing evidence of her failure to comply with that requirement in her case plan. "[A] parent's failure to comply with the requirements of court-mandated mental health counseling or parenting education courses is a factor [to] be considered to determine the likelihood of whether the deprivation is likely to continue or will not likely be remedied." In the Interest of G.L.H., 209 Ga.App. 146, 150(2), 433 S.E.2d 357 (1993).
4. Nevertheless, we find that the state failed to present any evidence as to the effect that such continued deprivation would have on the child. Although there are indications in the record that the child was receiving counseling, there was no testimony from any professional, or from any lay witness, that the child would suffer physical, mental, emotional or moral harm from the current situation. The only evidence that even touches upon this subject is the foster father's testimony that the child would sometimes become upset after visiting his mother and would need some time to calm down, but even he conceded that it was natural for the child to miss his mother. And on appeal, the state does not rely upon this evidence to support the conclusion that the child will suffer harm, but merely cites the proposition that the court can rely upon the same factors to find the potential for harm that it relied upon to find deprivation or the likelihood that the deprivation would continue. See In the Interest of J.J., 259 Ga.App. 159, 165, 575 S.E.2d 921 (2003).
We recently expressed concern and urged caution in applying this principle, noting that "it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child. Otherwise, the fourth part of the test would have no meaning." (Footnote omitted.) In the Interest of J.T.W., 270 Ga.App. 26, 37 (2)(d), 606 S.E.2d 59 (2004). That concern is well-founded in this case. Here, although the mother has not provided a clean home and has failed to follow the case plan to the letter, there is no indication that continued exposure to the mother will cause the child harm. Id. Cf. In the Interest of M.M., 263 Ga.App. 353, 359(1), 587 S.E.2d 825 (2003) (fact that mother's future employment prospects are slim and she is without appropriate living arrangements is not sufficient to terminate parental rights). Moreover, although the DFACS staff expressed concern about seeking permanency for the child, the state must first establish parental misconduct before the court may consider the best interest of the child.
"Because no judicial determination has more drastic significance than permanently severing a parent-child relationship, such severance must be exercised cautiously and scrutinized deliberately." (Footnote omitted.) In Interest of T.J.J., 258 Ga.App. 312, 314, 574 S.E.2d 387 (2002). We conclude that the evidence did not support a finding of parental misconduct and thus the trial court erred terminating the mother's parental *50 rights. In the Interest of B.F., 253 Ga.App. 887, 891-892, 560 S.E.2d 738 (2002).
Judgment reversed.
RUFFIN, P.J., and ELDRIDGE, J., concur.
NOTES
[1] The petition also sought to terminate the parental rights of T.P.'s father, but the father is not a party to this appeal.