**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**October 24, 2012**

# In the Court of Appeals of Georgia

A12A1232. IN THE INTEREST OF T. G., a child.

ADAMS, Judge.

The father of three-year-old T. G. appeals the trial court's order that terminated his parental rights. He contends that the evidence was insufficient to prove that T. G. was deprived by parental misconduct or inability and that the trial court erred in finding that terminating his parental rights was in T. G.'s best interest. For reasons that follow, we affirm.

> "On appeal from a juvenile court's decision to terminate parental rights, we review the evidence in the light most favorable to the court's decision and determine whether any rational trier of fact could have found by clear and convincing evidence that the parental rights should be terminated."

(Footnote and punctuation omitted.) *In the Interest of E.S.K.*, 299 Ga. App. 35, 35-36 (681 SE2d 705) (2009).

The Department of Family and Children Services ("DFACS") became involved with T. G. immediately after her birth when her mother, whose rights to three other children had been terminated, tested positive for cocaine. DFACS was granted temporary legal custody. Following a September 17, 2009 hearing, the juvenile court issued an adjudicatory order finding deprivation. The order was based on the facts that T. G. tested positive for cocaine at her birth, her mother had a lengthy history of unrehabilitated substance abuse, neither her mother or father had visited T. G. and her father requested a DNA test to prove paternity. In addition, neither parent was employed, and both received disability payments. DFACS retained temporary legal custody.

After DNA tests proved the father's paternity, he legitimated the child in January 2010. The permanency plan for T. G. was reunification concurrent with adoption. The case plan required the father to attend a substance abuse evaluation, submit to random drug screens, attend and successfully complete parenting classes, obtain and maintain a source of income/support for the child, maintain suitable

housing, and attend a psychological assessment and follow the recommendations of the therapist.

In August 2011, after both parents had undergone psychological assessments, DFACS filed a petition to terminate their parental rights. The petition alleged that the mother and father suffered from medically verifiable deficiencies of their mental and emotional health that rendered them unable to provide adequately for T. G.'s needs. At the hearing on the petition, a clinical psychologist testified about her evaluation of the mother and father. The mother had been diagnosed with schizophrenia for which she was taking medications. She self-reported a history of drug use. Based on tests she administered, the psychologist testified that the mother would be considered a higher risk for physical child abuse than the general public, was cocaine dependent, had mild mental retardation, and continued to show signs of a serious mental health condition even though she was receiving treatment for it. Her evaluation raised significant concerns about the risk of harm to the child from her mother.

Based on her evaluation of the father, the psychologist determined that he had mild mental retardation and could not read. He reported that he had never worked and was on disability status. She concluded that if he were to play a parenting role with the child, he would need significant support from others. Her concern was the

3

potential for neglect because of his extremely low cognitive level. The parenting situation would be even more difficult if the mother were present because of potential issues of physical child abuse.

Beginning in November 2010, T. G. was transported to a DFACS office for weekly supervised visitation with her parents. The counselor who brought T. G. to the visits and supervised them testified that the mother frequently became angry and used profanity and occasionally became violent during the visits. As a result, she was excluded from visitation for several months. The counselor testified that T. G. interacted well with the father during the visits and that the father tried to calm the mother down when she became agitated, but he was not successful.

The DFACS case manager testified that T. G. had been in the same foster care home since she left the hospital after birth and that the foster parents wanted to adopt her. The case manager testified about the negative effects of long term foster care, such as aggression, withdrawal, depression, and misbehavior at school.

At the time of the termination of parental rights hearing, T. G.'s biological parents continued to live together. Before filing the petition to terminate parental rights, DFACS discussed the possibility of the father parenting T. G. with the assistance of his niece, but the niece had never given the case manager any indication

4

that she wanted to be involved apart from attending a few parenting classes with the father. The father indicated that he wanted to work with the mother on the case plan.

The father's niece testified that she was willing to take T. G., but that she did not want any contact with the mother. She testified that her only income was disability payments. If she had T. G., she would want the father to be able to see her, but he would not live with her. At the conclusion of the testimony, the court continued the hearing to give DFACS an opportunity to screen the niece to determine if she would be an appropriate placement for T. G.

At the second hearing, the case manager testified about the results of DFACS's evaluation of the father's niece. Her home was determined to be appropriate, although she needed to obtain a bed for the child. A drug screen came back positive for marijuana. She and her brother were on the lease for her home, but her brother refused to be evaluated. Certain of her bills were being paid by other relatives, and her expenses exceeded her income, which consisted largely of social security payments. DFACS did not take a position on approving or disapproving the niece at that point. The hearing was continued again to allow the niece to be further evaluated.

At the third hearing, the case manager testified that DFACS did not consider the niece to be an appropriate placement because of inconsistent drug screens and

insufficient finances to provide for T. G. T. G.'s guardian at litem recommended that the court not terminate the father's parental rights because he had developed a bond with the child. She suggested that the court transfer custody to the father's niece. T. G.'s attorney concurred in that recommendation. The court took the matter under advisement.

In its order terminating the mother and father's parental rights, the court found that the father could not parent T. G. independently and that as long as he lived with the mother, the risks to the child were magnified. Although noting that the father loved T. G., the court found that his insistence on wanting to parent the child in the same household with the mother would be dangerous to T. G. The court could not place T. G. with the father's niece because of her illegal drug use, failure to have her co-tenant evaluated, and questionable financial stability. Whether the niece might be an appropriate placement at some point in the future was an issue left to DFACS to address.

"Georgia law requires that courts follow a two-step analysis in determining whether to terminate parental rights." *In the Interest of T. P.*, 270 Ga. App. 700, 703 (608 SE2d 43) (2004). First, the court must determine whether there is clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94 (a).

6

Second, the court must consider whether termination of parental rights is in the best interest of the child. Id. The court determines parental misconduct or inability by finding that (1) the child is deprived; (2) the lack of parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-94 (b) (4) (A).

1. The father claims that there was no clear and convincing evidence that T. G.'s deprivation would continue or that any continued deprivation would harm the child because he could live with his niece as a family unit or have his niece assist him in his home. He does not challenge the trial court's findings that T. G. was deprived or that lack of parental care or control was the cause of the deprivation.

The evidence shows that the father is not capable of caring for T. G. on his own, and that his niece was not deemed an appropriate placement for T. G. The mother continued to reside with the father, making his residence an unsafe place for T. G. to live. Moreover, in these circumstances, the test must be whether the parent standing alone is capable of mastering and can effectively demonstrate the ability to

7

utilize parenting skills. *In the Interest of H. F. G.*, 281 Ga. App. 22, 26 (1) (635 SE2d 338) (2006).

> The majority of cases in this state dealing with factual situations of this type have enunciated a rule that in termination cases the welfare of a child is of paramount importance provided there is also evidence that … the parent suffers from some mental disability that renders the parent unable to care for the child. … This case clearly fits that mold. There is no dispute that as of the time of the hearing and for the foreseeable future, the appellant [father] is unable to furnish proper parental care and control necessary for the child's physical, mental and emotional health and that these conditions and causes of deprivation are likely to continue for the foreseeable future.

(Footnote and punctuation omitted.) Id. at 27. Given the undisputed evidence that the father cannot independently fulfill his parenting responsibilities, we reach the same conclusion. Id.; see also *In the Interest of A. W.*, 264 Ga. App. 705, 706 (1) (592 SE2d 177) (2003) (disability that renders parent incapable of caring for child is valid legal basis for termination).

There was also sufficient evidence that the continued deprivation was likely to cause serious physical, mental, emotional or moral harm to the child. The father's inability to care for T. G. independently and his insistence on living with the mother, despite the potential harm to T. G., meant that placement with the father was not an

8

option. In fact, no one recommended that T. G. be placed with the father. With no suitable relative placement, the only alternative is indefinite foster care. The case manager testified about the potential harm associated with long-term foster care, which the juvenile court was authorized to consider in determining that continued deprivation would harm T. G. See *In the Interest of A. K.*, 272 Ga. App. 429, 438 (1) (d) (612 SE2d 581) (2005).

2. The father contends that the trial court erred in finding that it was not in T. G.'s best interest to allow him to parent the child. He points to the recommendations of the guardian at litem and the attorney for T. G. that his rights not be terminated.

> A juvenile court has broad discretion in determining how the interests of the children are best served. And under Georgia law, the same factors that show the existence of parental misconduct or inability may also support a finding by the juvenile court that the termination of parental rights is in the child[]'s best interests.

(Citations and punctuation omitted.) *In the Interest of B. L.*, 278 Ga. App. 388, 394 (2) (629 SE2d 89) (2006). Thus, the trial court was authorized to consider the factors discussed above, including the potential harm of long-term foster care. In addition, T. G.'s foster family had cared from her from birth and wanted to adopt her. See

9

OCGA § 15-11-94 (a) (court may consider children's need for a secure, stable home). We therefore conclude that the trial court did not abuse its discretion in finding that terminating the father's parental rights was in T. G.'s best interest. See *In the Interest of H. F. G.*, 281 Ga. App. at 26 (1); see also *In the Interest of D. F.*, 296 Ga. App. 625, 628 (1) (675 SE2d 531) (2009) (although father had bond with children, where relative placement that would allow father to maintain relationship did not work out, mental infirmities rendered him incapable of parenting the children without full-time assistance, and foster parents were taking good care of children and wanted to adopt them, termination of parental rights held to be in children's best interests).

*Judgment affirmed. Barnes, P. J., and McFadden, J., concur.*