A00A1914. IN THE INTEREST OF C. D. E. et al., children.
A00A1995. IN THE INTEREST OF S. K. S.-F.
(546 SE2d 837)

RUFFIN, Judge.

In these two cases, Patricia E. and Deryl E. appeal the juvenile court's order finding that several of their children were deprived and awarding temporary custody of those children to the Gwinnett County Department of Family & Children Services (DFCS). For reasons discussed below, we reverse the judgment in both cases.

In late 1999, Patricia and Deryl were living together with their infant son, D. E. (born July 24, 1999); three of Deryl's children from a

---

prior marriage, S. M. E. (born April 21, 1989), D. C. E. (born December 28, 1987), and C. D. E. (born May 20, 1985); and Patricia's daughter, S. K. S.-F. (born February 20, 1992) (referred to hereafter as S. K. S.). Deryl also had another teenage child, Cl. E., who had previously been placed in DFCS' custody due to severe emotional problems. At the time, Deryl was on probation for convictions for simple battery and obstruction.

In January 2000, Deryl was arrested on a domestic violence charge for pushing Patricia to the ground while she was holding their baby, D. E. On February 14, 2000, DFCS filed deprivation petitions with respect to S. M. E., D. C. E., C. D. E., and S. K. S.,[1] alleging that there was domestic violence in the home. Following a hearing on that date, the trial court entered an order temporarily awarding custody of the children to DFCS pending a final deprivation hearing.

The final deprivation hearing was held on February 28, 2000. At the beginning of the hearing, the court was advised that S. K. S.'s father, Derek Franco, had filed a motion to change custody of S. K. S. The court indicated that it would consider the issue of S. K. S.'s deprivation at the hearing, but would not consider the change of custody motion until a later time.

The evidence presented at the hearing was very sketchy and largely based on hearsay. Nancy Conrey, a DFCS caseworker, testified that she was "assisting on the investigation" with respect to the various children, although she did not specify her precise role in the investigation. She testified that the children had been removed from Patricia and Deryl's home due to

> [r]epeated incidents of domestic violence in the home. The issues between [Deryl] and [Patricia]. The children telling us in separate interviews repeated incidents of [Deryl] beating [Patricia]. The children continually exposed to this in the home. Also "C. D. E.," the 14-year-old, allegedly being physically abusive to [Patricia] which she chose not to handle through our recommendation to Juvenile Court for an unruly. We've documented, you know, domestic violence on [Deryl] from '88 up until the present and he's been in the anger management classes because he's on Federal probation and now on State probation for domestic violence and it doesn't seem to be working.

Although Conrey referred to "repeated" and "documented" incidents of domestic violence, it is apparent from her testimony that she

---

[1] DFCS apparently also filed a petition with respect to the infant, D. E., but that petition is not contained in the record, and these appeals raise no issues with respect to D. E.

had no personal knowledge of any such incidents. Rather, she relied completely on information related to her by others, primarily statements she claims were made by some of the children to unidentified persons at DFCS. Deryl's attorney objected to these statements on hearsay grounds, requesting that the judge interview the children himself, and the judge responded, "Okay. All right." However, the judge never actually questioned the children regarding the alleged violence, and no evidence of any specific allegations by the children was introduced. Conrey also stated that "there's evidence that [Patricia] maltreats . . . 'C. D. E.' and 'D. C. E.,'" but offered no explanation as to what that evidence might be.

Conrey testified that Deryl had completed a court-ordered psychological evaluation, and the psychologist's written report was offered into evidence without objection. The report indicated that it was based on one interview session with Deryl, as well as information about Deryl and his family provided to the psychologist by Conrey. The report offered no conclusions regarding Deryl's ability to properly parent his children, but nevertheless recommended that he "not get his children back at this time." The psychologist who prepared the report did not testify at the hearing.

Patricia testified that, in 1996, she had taken out a warrant against Deryl for simple battery. She did not, however, offer any details regarding the incident. Deryl went to prison for a time,[2] and there were no more violent incidents after he was released until late 1999 or early 2000. While Deryl was in prison, Patricia had custody of his children from his earlier marriage.

Patricia testified that her relationship with Deryl deteriorated in late 1999, largely as a result of stress over how to deal with C. D. E., who Patricia said had become sexually active with an older man. By the beginning of December, Patricia and Deryl were arguing "on a regular basis." Patricia testified at the deprivation hearing that, shortly before his January arrest, Deryl had begun to "get physical" with her, such as by biting her head or banging her head against a wall or door frame.[3] She said that none of these incidents, however, had resulted in any bruising. She testified that she "told [Deryl] if it

---

[2] It is not clear whether he went to prison on this or another charge or how long he remained in prison.

[3] Patricia did not actually describe these incidents of domestic violence or provide any details regarding them, but simply testified as follows:

Q. Now, there was an incident back in January where you took out an arrest warrant for your husband; is that correct? A. That is correct. Q. You reported that your husband regularly abuses you via biting your head or banging your head into a wall or door frame; is that correct? A. That is correct. Q. Do you stand by those statements today? A. Yes, sir, I do.

When asked, "How often would that occur," she stated that she and Deryl had been arguing "[s]everal times a week," but did not quantify the amount of physical violence except to state

ever happened again that it would be the last time." In January, Deryl pushed her to the ground while she was holding their five-month-old child, D. E. It was this incident that caused her to take out a warrant for Deryl's arrest.

Patricia testified that, except for the one incident when she was holding their baby, none of the children ever observed any acts of violence by Deryl. She testified that, after she had their father arrested, the situation with Deryl's children "got way out of control." According to Patricia, they "started threatening me that they were going to have me arrested and call DFACS on me because I had done this to their father." She testified that she and Deryl were no longer living together and had agreed to get a divorce. She promised to abide by any restrictions the court imposed on Deryl having contact with her or her children.

Jane Hudson, a licensed clinical social worker, testified that she had observed Patricia and Deryl and their children on several occasions, as part of a family assessment conducted in connection with Deryl's son Cl. E., who had previously been placed in DFCS' custody. Hudson testified that "[Patricia and Deryl] have a wonderful family. They have beautiful, very intelligent children, and they do a lot of things together as a family." She said, however, that "I think the children have ambivalent feelings. I think they at times feel very, very attached to Patti and to [Deryl]. And then at other times, I think they feel concerned; and, at times, afraid in the home." When asked whom the children were afraid of, she said that the children "expressed indirectly being afraid of [Deryl]." When asked exactly what the children had said or done to give her this impression, she testified that "[d]uring a family session . . . they said that they wanted to talk about some things in my presence but were concerned that there might be repercussions after the fact." Other than this cryptic reference to a desire to talk about "some things," Hudson offered nothing to support her belief that the children were at times afraid of Deryl.

Hudson testified that she had no concerns about Patricia's ability to parent, although she noted that Deryl's children "have pretty ambivalent feelings" toward her. With regard to Patricia's own children, Hudson said: "Do I have any concerns about Patti's ability to parent [S. K. S.] or [D. E.], no I don't."

DFCS presented no testimony from any of the children and presented no evidence as to how the children were affected by any family violence. It offered no evidence that Deryl had ever abused any of his children and offered no evidence regarding his fitness as a parent.

---

that "[i]t had just recently started to get physical" and that "he had struck me a few times before [the January incident]."

At the conclusion of the hearing, the trial court stated that it

finds by clear and convincing evidence that these children are deprived. They have been subjected to violence in the home, repeated violence visited upon the mother by the father. . . . [L]ooking at this psychological report, [Deryl] here appears to be somewhat of a walking time bomb that presents a danger to his own children and his own family.

Although stating that "these children" were deprived, the trial court announced that it was

going to withhold disposition in regards to [S. K. S.] I want to hear more evidence at another time and she will remain in the temporary custody of the Department based upon what we have previously discussed. And we will complete the hearing on [S. K. S.] when I hear evidence regarding Mr. Franco and [Patricia's] concern about Mr. Franco and how we should go on that.

The court subsequently entered a written order setting forth its ruling. Although the court had orally stated that it would withhold judgment regarding S. K. S., the written order found that all of the children, including S. K. S., were deprived. The order provided that DFCS would retain custody of all the children except the infant, D. E., who was to remain in Patricia's custody provided that she have "absolutely no contact with [Deryl]."

In Case No. A00A1995, Patricia appeals the deprivation order as it relates to S. K. S. In Case No. A00A1914, Deryl appeals the deprivation order as it relates to S. M. E., D. C. E., and C. D. E.

## Case No. A00A1995

1. In her appeal, Patricia contends that there was insufficient evidence to support the trial court's finding that S. K. S. was deprived. We agree.

OCGA § 15-11-2 (8) (A) provides that a child is deprived if she "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[4] We have held that

to authorize a . . . loss of temporary custody by a child's parents, on the basis of deprivation, the deprivation must be

---

[4] Subsections (B), (C), and (D) of OCGA § 15-11-2 (8) describe other ways in which a child may be deprived, but they are not relevant to these appeals.

shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.[5]

An order temporarily transferring custody of a child based on her alleged deprivation must be "grounded upon a finding that the child is *at the present time* a deprived child,"[6] and "[a] finding of parental unfitness is essential to support an adjudication of *present* deprivation."[7] Clear and convincing evidence is required to support a finding of deprivation.[8] On appeal, we determine whether,

> after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[9]

At trial, there was absolutely no evidence presented that Patricia was anything other than a fit parent for her children. Indeed, the only person who even expressed an opinion on the subject testified that she had no concerns whatsoever about Patricia's ability to parent her children. The only basis for asserting that any of the children were deprived was *Deryl's* violence toward *Patricia*. Even assuming that spousal abuse alone could support a finding that a child is deprived, the evidence was undisputed that Patricia and Deryl were no longer living together at the time of the deprivation hearing and were in the process of obtaining a divorce. Thus, that cause, if any, of

---

[5] *In the Interest of D. H.*, 178 Ga. App. 119, 124 (342 SE2d 367) (1986). See also *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998).

[6] (Emphasis supplied.) *In re J. C. P.*, 167 Ga. App. 572, 576 (307 SE2d 1) (1983).

[7] (Emphasis in original.) Id. at 575.

[8] *In the Interest of D. E. K.*, 236 Ga. App. 574, 577 (512 SE2d 690) (1999). See also OCGA § 15-11-56 (b) (1).

[9] (Citations and punctuation omitted.) *In the Interest of S. E. H.*, 180 Ga. App. 849, 850 (350 SE2d 833) (1986). See also *In the Interest of D. S.*, 217 Ga. App. 29, 31 (456 SE2d 715) (1995) (physical precedent only).

deprivation had been removed with respect to Patricia's children. The trial court apparently recognized this in its order, allowing Patricia to retain custody of her youngest child on the condition that she have no further contact with Deryl.[10] Accordingly, there was absolutely no basis for the trial court to conclude that Deryl's abuse of Patricia rendered S. K. S. a deprived child at the time of the deprivation hearing.[11]

DFCS asserts that the trial court's order must be upheld because there is no guarantee that Patricia and Deryl will not reconcile at some point. We note that no evidence was presented at trial that Patricia has any intent of reconciling with Deryl, and she was quite firm in her insistence to the contrary. Thankfully, we have not yet reached the point where the State is authorized to take children away from an admittedly fit mother based solely on the mere possibility that she may in the future have contact with someone who has previously beaten her.[12]

Because there was no evidence, much less clear and convincing evidence, that S. K. S. was a deprived child at the time of the deprivation hearing, the juvenile court erred in removing the child from her mother's custody and transferring custody to DFCS.[13]

## Case No. A00A1914

2. In his appeal, Deryl contends that the evidence was insufficient to support the trial court's finding that S. M. E., D. C. E., and C. D. E. were deprived. We agree.

The trial court's order does not clearly state the basis for the court's conclusion that Deryl's children are "deprived" within the meaning of OCGA § 15-11-2 (8). Rather, the order simply states that the children are deprived and then describes various facts and conclusions, without clearly articulating how the children are without proper parental care or control or how Deryl is an unfit parent. It is apparent, though, that the court's ruling is based upon Deryl's acts of domestic violence against his wife and upon the court's conclusion that Deryl is "a walking time bomb." In reciting the facts that are apparently meant to support this conclusion, however, the court in many instances either misstates the evidence, relies on irrelevant

---

[10] The court gave no explanation of why it believed Patricia was fit to retain custody of D. E., but not S. K. S.

[11] See *D. E. K.*, supra at 578 (mother's "relationship with an abusive husband," even combined with other factors, was not sufficient to render child deprived so as to authorize temporary transfer of custody to DFCS).

[12] See id. at 577 (mother had history of reconciling with abusive husband, but testified that she was going to get a divorce "as soon as she saved enough money to obtain a lawyer").

[13] See id.

and unproven allegations or hearsay statements, or draws conclusions that are not supported by the evidence.[14]

In describing the incident that led to Deryl's arrest, for example, the trial court states that "[Deryl] threw [Patricia] . . . to the ground. He slammed her head, held her briefcase to her head and threatened to kill her. One child was in the home and heard the violence." This description of the facts is inaccurate in several significant respects. First, there is absolutely no evidence that Deryl "slammed" Patricia's head, "held her briefcase to her head," or "threatened to kill her." To the contrary, in the only description of the event offered at trial, Patricia testified that Deryl "pushed me down on the ground with a briefcase and threatened me and I can't remember his exact wordage."[15] Although this may constitute simple battery, the trial court's description greatly overstates the severity of the incident, providing specific and inflammatory details that are not supported by the evidence. The trial court's statement that "[o]ne child . . . heard the violence" is also not supported by the evidence. Rather, Patricia simply testified that S. K. S., who was in her room at the time, "heard us arguing . . . and she knew I was upset." These misstatements of the evidence suggest that the court's ultimate conclusion was based on a flawed view of the facts.

The trial court also states in its order that "[C. D. E.] has alleged that she is the victim of physical abuse from the parents." This statement appears to have no support in the record, however, since C. D. E. never testified at trial and no witness testified that she had made any such allegations.[16] More fundamentally, even if such an allegation had been made, the trial court did not purport to find that it was true, and an unproven allegation of abuse cannot support a finding that someone is "a walking time bomb" who is a danger to his children. The trial court's inclusion of this supposed allegation in its order indicates that it was a factor influencing its ruling, once again suggesting that the court based its conclusion on a flawed view of the facts.

The trial court also apparently based its finding of deprivation, in part, on the fact that Deryl "has been diagnosed with a bipolar dis-

---

[14] Indeed, the court prefaces its findings and conclusions by stating that, "[t]he Court specifically finds, *and all parties agree*, as follows," when it is quite apparent that the parties did not agree to the court's findings and conclusions. In fact, at the beginning of the deprivation hearing, the trial court specifically asked Patricia's attorney, "Do you contest the allegations [of deprivation]," and the attorney responded, "Yes." We thus find puzzling the trial court's assertion that "all parties agree."

[15] It appears that the trial court focused on the attorney's question to Patricia — "Did he slam your head on the ground and threaten to kill you?" — rather than on Patricia's answer. Questions, of course, do not constitute evidence.

[16] Conrey did state in passing that "there's evidence that [Patricia] maltreats . . . 'C. D. E.' and 'D. C. E.,'" although she did not bother to explain what that evidence was.

order." It is true that, in determining whether a child is without proper parental care or control, and thus a "deprived child,"[17] a court may consider "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child."[18] However, even assuming that Deryl had been diagnosed with a bipolar disorder,[19] the court completely failed to discuss how such condition was relevant to a finding of deprivation. Indeed,

> [t]he record is devoid of any evidence describing what the behavior is or how it might limit [Deryl's] parental abilities. So even though there may have been such a diagnosis, there is no evidence of a medically verifiable mental or emotional deficiency that renders [Deryl] unable to provide for the needs of [his] child[ren].[20]

The trial court also relied heavily, if not exclusively, on the psychological report to conclude that Deryl is "a walking time bomb" who "presents a danger to his own children." As discussed above, however, the psychologist who prepared the report did not testify at the hearing and thus was not subject to cross-examination. As we have previously held, "records which contain diagnostic opinions of third parties who are not available for cross-examination are generally inadmissible."[21] Although there was no objection to the introduction of the report, hearsay evidence has no probative value even when it is admitted without objection.[22] Accordingly, the trial court erred in relying on the psychological report as the basis for its conclusion that Deryl is a walking time bomb.[23] And given the court's express reliance on the report, we cannot apply the principle that judges are presumed to "separate the wheat from the chaff" and to ignore hearsay

---

[17] See OCGA § 15-11-2 (8) (A).

[18] OCGA § 15-11-94 (b) (4) (B) (i).

[19] There was no expert testimony that Deryl had been diagnosed with a bipolar disorder. The only evidence to that effect was (1) Conrey's claim that Deryl "provided [her] with the information from Dr. Mayfield about him being bipolar," and (2) hearsay statements in the psychologist's report that Deryl had said he had recently been diagnosed.

[20] *In the Interest of A. G. I.*, 246 Ga. App. 85, 87-88 (2) (a) (539 SE2d 584) (2000).

[21] *In the Interest of J. T. S.*, 185 Ga. App. 772, 773-774 (2) (365 SE2d 550) (1988).

[22] See *In the Interest of A. F.*, 236 Ga. App. 60-61 (1) (510 SE2d 910) (1999).

[23] See *In the Interest of M. A. C.*, 244 Ga. 645, 655 (4) (261 SE2d 590) (1979). OCGA § 15-11-56 (c) provides no basis for the trial court to consider hearsay statements made in the psychological report, as that section applies to dispositional hearings, and not to factfinding hearings on the threshold issue of deprivation. See *In the Interest of J. C.*, 242 Ga. 737, 740-741 (251 SE2d 299) (1978); *In the Interest of D. S.*, 212 Ga. App. 203, 204 (441 SE2d 412) (1994).

evidence in making their determinations.[24]

In any event, even if the psychologist's report constituted competent evidence, it provides no support for the trial court's conclusion that Deryl is a danger to his children. In this regard, the actual conclusions stated in the report deserve quoting at some length:

> Test findings indicate that [Deryl] is depressed. . . . In fact, he appears at present to be experiencing a fair amount of emotional stress that is giving rise to unpleasant affect and increasing his *susceptibility* to becoming depressed. . . . This *may be* reducing his usual level of effectiveness in making decisions and pursuing courses of action. . . . That his psychological resources are insufficient to meet the demands he is experiencing makes it *likely* that his capacity for self control is impaired and that he has a marked *tendency* toward impulsiveness in what he thinks, says and does. [Deryl's] persistent difficulty in mustering adequate resources to cope with demands being imposed on him by circumstances in his life places him *at risk* for recurrent episodes of *anxiety, tension, nervousness and irritability*. It is *likely* that . . . he has *less than average* ability to persevere in the face of obstacles. He is *likely* to show a *tendency* toward impulsive outbursts of unwarranted affect and/or ill-advised actions. . . . [Deryl] is *at risk* for being psychologically incapacitated, at least temporarily, and for appearing to others as *noticeably agitated and distraught*. . . . [H]e is *likely* to be an emotionally immature person who experiences and expresses affect in an overly dramatic and overly intense manner. [Deryl] has oppositional tendencies that are *likely* to be *associated with* underlying anger and resentment toward people and toward the world in general, *possibly* including negativity toward authority. . . . [Deryl] *appears* to be *less capable than most* people of dealing effectively with his everyday experiences. . . . His limited social skills are *likely* to be contributing to *awkward, inept or inappropriate management* of his interpersonal relationships.[25]

Although the sheer length of the report might suggest extreme emotional problems rendering Deryl an unfit parent, a closer reading

---

[24] See *McBride v. State*, 247 Ga. App. 767, 770 (1) (545 SE2d 332) (2000) (presumption that court correctly applies the law is inapplicable where it affirmatively appears to the contrary). Cf. *M. A. C.*, supra ("When a trial judge considers both admissible and inadmissible evidence, it is presumed that he separates the wheat from the chaff.").

[25] (Emphasis supplied.)

shows nothing of the sort. In addition to the abundance of qualifying language ("likely," "tendency," "at risk," "may," "possibly," "less than average," "less capable than most") — which undoubtedly reflects the fact that the report is based on a single interview session — the report conspicuously fails to conclude, or even to suggest, that Deryl poses any threat whatsoever to his children or that his emotional makeup renders him unable to provide proper parental care and control. Indeed, nothing in the report even addresses Deryl's relationship with his children or his ability to parent. Rather, the report indicates that he is "susceptib[le]" to becoming "depressed," that his stress gives rise to "unpleasant affect," that he "may be" less "effective" than "usual" in "pursuing courses of action," that it is "likely" he has a "tendency" toward "impulsiveness," that he is "at risk" of "anxiety, tension, nervousness and irritability," that he is "likely" to have a "tendency" toward "impulsive outbursts of unwarranted affect" (whatever that means), and that he has "limited social skills" that are "likely" to "contribute" to "awkward, inept or inappropriate management" of "interpersonal relationships." Although such tentative descriptions of Deryl's possible emotional makeup may be of interest to a psychologist, they provide no basis to conclude, by clear and convincing evidence, that Deryl is "a walking time bomb" who "presents a danger to his own children."[26]

As discussed above, the trial court's mischaracterization of evidence and reliance on inadmissible evidence — evidence the court thought significant enough to discuss in its order — calls into question the reasoning behind the court's implicit conclusion that Deryl is unable to offer proper parental care or control because he is a danger to his children. Even if the evidence, properly characterized, were sufficient to support such a conclusion, we would thus be required at a minimum to vacate the court's judgment and remand for reconsideration.[27] We do not, however, believe the evidence is sufficient for a factfinder to conclude, by clear and convincing evidence, that the children are deprived.

As stated above, a child is deprived if he is "without proper parental care or control."[28] In order to justify a temporary transfer of custody, the deprivation must be based upon the unfitness of the par-

---

[26] Although the report recommends that Deryl "not get his children back at this time," nothing in the report suggests that this recommendation is anything more than the personal preference of the psychologist.

[27] See, e.g., *In the Interest of J. B.*, 241 Ga. App. 679, 680 (1) (527 SE2d 275) (1999) (deprivation order must, in addition to reciting factual findings, show "how those facts give support to . . . the separate conclusions" and "state . . . the process by which [the court's decision] was reached").

[28] OCGA § 15-11-2 (8) (A).

ent.[29] In this case, there was absolutely no evidence presented relating to Deryl's ability to parent his children. The only evidence arguably bearing on this issue was that he had on an unspecified number of occasions committed acts of domestic violence against his wife, although none of these acts was witnessed by his children and none was severe enough to cause bruising. The issue in a deprivation hearing involving a transfer of custody, however, is not whether the parent has committed illegal acts, but whether there is "intentional or unintentional misconduct resulting in the abuse or neglect of the child or . . . what is tantamount to physical or mental incapability to care for the child."[30]

Even where the parent has been convicted and incarcerated for commission of a felony, a finding of parental unfitness must be based on a showing that there is "a demonstrable negative effect on the quality of the parent-child relationship."[31] Here, DFCS failed to present any evidence that Deryl's misdemeanor acts of domestic violence against Patricia, with whom he is no longer living, had any negative effect on his relationship with his children. Nor was there any evidence that Deryl had ever abused or neglected his children or that he was likely to do so in the future. In the absence of such evidence, there was no clear and convincing basis for the trial court to conclude that the children were deprived within the meaning of OCGA § 15-11-2 (8) (A).[32]

3. Due to our rulings above, it is not necessary to address the other enumerations raised by Patricia or Deryl.

*Judgments reversed. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 6, 2001 —
RECONSIDERATION DENIED MARCH 26, 2001.

*David L. Whitman, Sandra D. Hicks*, for appellants.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Cheeley & Joyner, John P. Cheeley*, for appellee.

---

[29] See *D. H.*, supra.

[30] *D. H.*, supra.

[31] OCGA § 15-11-94 (b) (4) (B) (iii).

[32] Compare *In the Interest of J. L. M.*, 204 Ga. App. 46, 47-48 (418 SE2d 415) (1992) (upholding finding of parental unfitness in parental rights termination case where father murdered children's mother, but only because murder was accompanied by other evidence of parental unfitness).