**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**July 2, 2025**

# In the Court of Appeals of Georgia

A24A1822. IN THE INTEREST OF D. H., et al., CHILDREN (MOTHER)

A25A0351. IN THE INTEREST OF D. H. et al., CHILDREN (FATHER).

GOBEIL, Judge.

The biological father ("Father") and mother ("Mother") of two minor brothers each appeal the juvenile court's determination that the children are dependent as to each parent. For the reasons set forth below, we affirm in both appeals.

As we have explained before,

the juvenile court may place a minor child in the protective custody of the Department [of Family and Children Services] where the State shows, by clear and convincing evidence, that the child is a dependent child. . . . [O]n appeal from an order finding a child to be a dependent

child, we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead[, we] defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened.

*In the Interest of S. C. S.*, 336 Ga. App. 236, 244-245 (784 SE2d 83) (2016) (citations, punctuation, and footnote omitted). So viewed, the record before us shows as follows.

As relevant to this matter, Father and Mother are parents to two boys, Dy. H., born in 2017, and Da. H., born in 2020.[1] Prior to the events giving rise to this matter, the boys were in the care and custody of Mother. However, in February 2024, Mother had an alleged "mental health breakdown," and, following a hearing, at which Mother testified, the two boys were removed from her custody on an emergency basis. In a subsequent dependency petition, the Gwinnett County Department of Family and Children Services ("the State" or "the Department") alleged that, in early February

---

[1] In the hearing transcripts, Dy. H. is referred to as "DH-20," while Da. H. is referred to as "DH-19."

2

2024, "[M]other had a mental health crisis wherein [she was] reported to have been in possession of a loaded firearm, led law enforcement on a high-speed chase, drove her car towards Lake Lanier, and attempted to jump into [the lake] before she was apprehended by law enforcement." The petition further alleges that, at the time of her arrest, Mother told police officers that "the devil was trying to hurt the children[] and [that] she was trying to save [them]." As to Father, the petition alleged that there was "an unsubstantiated allegation of sexual abuse involving father and [Dy. H.]" and that Father had "had no contact with the children for over two years." The Department later amended its complaint to reflect that the parents should be required to provide proof of both housing and employment.

In a subsequent two-day hearing , the juvenile court received testimony from numerous witnesses. With respect to Mother, the juvenile court heard from law enforcement that, in February 2024, the Flowery Branch Police Department received several 911 calls from a local apartment complex that a driver — later identified as Mother — had rammed the entrance gate with her vehicle, had hit another car, and was "beating" on the door of an apartment while armed with a loaded firearm.

3

Mother apparently left the apartment complex in her vehicle, and law enforcement "put a lookout for her vehicle."

When police observed her vehicle and attempted to initiate a traffic stop, Mother fled; she led police on a two-to-three mile pursuit and nearly drove into Lake Lanier. When she was apprehended, Mother told the arresting officer "that she was looking for her kids" who, she claimed, were "with the devil." Mother apparently told the arresting officer that the devil was "everywhere" and that "she was just trying to do the Lord's work." The arresting officer speculated that, at the time of her arrest, it was "possible" that Mother was suffering from either "mental health issues" or was "under the influence of drugs and alcohol." Mother was ultimately charged with various felony offenses that remained pending at the time of the hearing.

The juvenile court also received testimony from Mother. She testified that she had a total of five children, two of whom are with Father. According to Mother, she and Father — along with the two children — lived together for a few years, during which time Father struck Dy. H. so hard that the child fell from his seat and caused a picture to fall from the wall.[2] On another occasion, Father threatened to throw Dy.

---

[2] A video of this incident was played during the hearing, and Father acknowledged the incident.

H. from a window because he would not stop crying. The two parents eventually parted ways in November 2021, at which point, Mother says, Father "decided that he didn't want to be in the boys' life anymore." According to Mother, Father did not have contact with the two boys, visit them, or provide financial assistance between November 2021 and August 2023 ; Mother reported that Father expressly told her that she could "have" Dy. H. because he did not "want to be his dad anymore." Later, in February 2022, Mother took Dy. H. for counseling because he "started making these crazy allegations about inappropriate things that [Father] did to him."

When asked about the February 2024 incident, Mother testified that she did not recall certain details; alternatively, she asserted her Fifth Amendment right against self-incrimination. Mother did acknowledge, however, that, after the incident, a "psychologist" from "Northeast Medical" told her that she was "having a manic episode." Mother also testified that she was overwhelmed and exhausted "from being a mother;" that she had not been sleeping; that she had been experiencing persistent "brain fog;" that she had previously had periods of "blacking out;" and that her instability, brain fog, blackout, and the February 2024 incident were all attributable to "a piece of metal, [a] foreign object" left in her mouth after a dental procedure.

Finally, Mother acknowledged that she was unemployed and that she had a history of leaving the children with family members — including her husband, mother, and brother — who had significant criminal histories.[3]

The juvenile court also heard testimony from an attorney who was a self-described "auntie" or "godmother" to Mother. The attorney testified that she found Mother's parenting style to be "loving, interactive, [and] caring," and she explained that, until the February 2024 incident, she had never known Mother to have any mental health issues. She admitted that she had advised Mother to seek counseling with a psychologist. The attorney also testified that, while she was initially impressed with Father's parenting, "his whole attitude changed" after he "split up" with Mother; according to the attorney, Father seemed to "just shut down." The attorney explained that Father went years without seeing his children — or helping financially — and that, when she asked Father why he was not visiting or supporting the two boys, he responded that he had decided to simply "concentrate on his career."

---

[3] The juvenile court heard testimony that, at the time of the hearing, Mother's mother was facing felony charges, that Mother's brother "has a criminal history of homicide," and that Mother's husband "is on probation out of the Federal District Court in Tennessee."

As to Father, he acknowledged that, between November 2021 and February 2024, he had no contact with either Dy. H. or Da. H. other than two phone calls; Father also acknowledged that he had not attempted to reach out to the two boys through other family members, despite having had the relevant contact information.[4] As for parenting the two boys, Father admitted that he "deferred" to Mother in this respect and that he had little experience raising children. Father also addressed his criminal history, testifying that he had been convicted of a sexual offense in Michigan — specifically, criminal sexual conduct in the second degree — and had been required to register as a sex offender until he successfully petitioned to have that restriction lifted in 2014.[5] As far as his employment, Father testified that he was previously a "senior vice president" but left that position to be a stay-at-home father to Dy. H.; Father testified that he now works as a business consultant and that he makes approximately $22,000 per year. Regarding his living arrangements, Father testified

---

[4] Despite this, Father filed for custody in April 2023.

[5] While Father maintained that the offense was a "Romeo and Juliet situation" that had occurred just after he turned 18, the evidence presented below reflects that the offense to which he pled guilty "involve[d an element of] some type of serious injury."

that he lives with his brother and his brother's fiancee in a two-bedroom townhouse and pays approximately $500 per month in rent.

The juvenile court also heard from a psychologist who had been treating Dy. H. for approximately two years. The psychologist testified that, during Dy. H.'s initial intake session, the child reported that "his father had put a toy car in his butt and had put fingers in his butt." According to the psychologist, Dy. H.'s outcry was not an isolated occurrence; Dy. H. brought up the incidents during subsequent sessions and was "consistent with his statements [as] to . . . what his father had done" . The psychologist also testified that the child was observed exhibiting behaviors consistent with having been sexually abused , such as "humping furniture at home" and "touch[ing] his younger brother on the bottom."[6] Finally, the psychologist explained that Dy. H. had been diagnosed with a mood disorder and suspected sexual abuse.

The juvenile court also received testimony from an individual employed with the Georgia Counseling and Rehabilitative Services as a "transporter" and visitation supervisor. The employee testified that she transported the boys to visit with Father

[6] The juvenile court also received testimony that Mother reported the issue to law enforcement and that Dy. H. underwent a forensic interview; Dy. H. made no outcry during that interview, and law enforcement declined to pursue the matter any further.

and that the boys were always very excited to meet with him; according to the GCRS employee, when Father was around the children, he was "very gentle, very tender . . . [a] loving . . . caring person and sensitive." The employee acknowledged, however, that each of Father's visits was like a "theme party" complete with presents and special treats, such as donuts, smoothies, or ice cream.

Finally, the juvenile court received a recommendation from the Guardian ad Litem. The GAL recommended that the juvenile court conclude that the Department had "met its burden of proving dependency by clear and convincing evidence . . . that the children are dependent as to both parents." With respect to Mother, the GAL asserted — focusing on OCGA § 15-11-311 — that Mother had suffered a "mental health breakdown" and that she had "not provided anything where that mental health ha[d] been addressed." As to Father, the GAL explained that, based on his own admission, he had abandoned the children. The GAL asserted that Father had failed to maintain a meaningful parent relationship with the children and, further, that the abandonment was not cured by a couple of phone calls within that time frame or his most recent supervised visits with the children. The GAL also highlighted the fact that Father lacked stable income, as well as stable and suitable housing; the GAL noted

9

that Father was not on the lease where he lived. Finally, the GAL was further concerned with the possibility of Father sharing a bedroom with the children in light of the sexual abuse allegation.

During the hearing, both parties moved for a directed verdict; however, the juvenile court denied both motions from the bench. Approximately a month after the conclusion of the hearing, the juvenile court entered a detailed order determining that both children were dependent as to both parents; that order was amended several weeks later to correct the date of the next hearing

As to Mother, the juvenile court found the following facts in the amended order: that she was unemployed; that she had struggled with employment and housing stability; that she had left her children in the care of individuals with significant criminal histories; that Mother was herself facing felony charges; that Mother acted as alleged with respect to the February 2024 incident; that police officers believed that Mother's behavior could have been "due to mental health issues"; that Mother was having a "manic episode" during the February 2024 incident; that Mother was overwhelmed by being a parent; that Mother has suffered from memory problems, blackouts, and brain fog; that, while Mother attributed these ailments to dental

problems, dental records showed no issues; and that Mother had been recommended to seek therapy from a psychologist.

As to Father, the juvenile court found the following facts in the amended order: that Father relied on Mother because he did not have parenting experience; that video evidence showed Father hitting or slapping Dy. H. with such force that it caused the child to fall from his seat and a picture to fall from the wall; that Father once threatened to throw Dy. H. from a balcony; that Father had not seen or financially supported the two boys since November 2021, despite having the means to communicate with Mother and her family; that, in November 2021, Father expressed that he no longer wanted to be a father to the two boys; that, at the time of the dependency petition, the youngest child did not know Father; that Father's subsequent supervised visits were not "meaningful parenting time" but, instead, "were a party with a theme"; that Father is not employed full time, has failed to verify his income, and reports a yearly income of only $22,000, yet drives a BMW automobile; that Father resides in a two-bedroom townhouse with two other adults; that Father has been convicted of a sexual offense, that he was previously a registered sex offender, and that Father had not been forthcoming about the details of that

conviction; that Dy. H. has made an outcry of sexual abuse by Father; and that the child has consistently repeated the abuse allegation and has exhibited behaviors consistent with a child who has been sexually abused.

Based on these findings, the juvenile court concluded that, as a matter of law, the two brothers are "dependent children as defined in OCGA § 15-11-2 (22) in that they have been abused or neglected and are in need of the protection of the Court." Specific to Mother, the juvenile court — citing OCGA § 15-11-311 (1) — concluded that Mother had neglected Dy. H. and Da. H. by failing to provide "proper parental care and control" owing to "a medically verified deficiency of [her] physical, medical, or emotional health that is of such duration or nature so as to render [her] unable to provide adequately for . . . her child[ren]." In support of this conclusion, the juvenile court pointed to the February 2024 incident — which the Mother testified a psychologist had diagnosed as a "manic episode" — as well as Mother's self-reported history of brain fog, blackouts, and memory loss. Indeed, the juvenile court expressly concluded that the two boys "cannot be adequately and safely protected at home [because] Mother has untreated mental health issues[.]"

As to Father, the juvenile court concluded that there was clear and convincing evidence that he had abandoned the children, that he had failed to provide proper parental care and control of the children, and that he had sexually abused Dy. H. The juvenile court emphasized that Father admittedly had no contact with the children for approximately two years; that Father did not refute the evidence that he had told others that he no longer wanted to be a parent to the boys; that Father lacked stable housing and income; and that he had physically and sexually abused Dy. H.

Following the juvenile court's order, Father and Mother each individually filed a motion for new trial and a motion to vacate.[7] The juvenile court denied these motions following a hearing. Both parents now appeal the juvenile court's order, and we address each appeal below.

*A24A1822*

1. On appeal, Mother argues that the juvenile court's reliance on OCGA § 15-11-311 (1) was misplaced and that the record is "devoid of the detail necessary to make

___

[7] Mother later withdrew her motion for new trial.

conclusions about the mother's medical conditions, its effect on [her] parenting skills, or the likelihood that it would continue." We disagree.[8]

We start with the relevant statutory authorities. We turn first to OCGA § 15-11-2 (22), which provides, in relevant part, that the term "'[d]ependent child' means a child who . . . [h]as been abused or neglected and is in need of the protection of the court[.]" Here, the juvenile court determined that Mother had neglected the two brothers, which, as defined in OCGA § 15-11-2 (48)[9] means, as relevant here, "[t]he failure to provide proper parental care or control[.]" To find that a child is "without proper parental care and control" the juvenile court may consider the "medically verified deficiency of such child's parent's physical, mental, or emotional health that is of such duration *or* nature so as to render such parent unable to provide adequately

---

[8] Mother's motion to strike the GAL's appellate brief as untimely and her motion for leave to file a reply brief are hereby DENIED. See *Luca v. State Farm Mut. Automobile Ins. Co.*, 281 Ga. App. 658, 663 (3) (637 SE2d 86) (2006) (failure to timely file brief may result in non-consideration of brief, but Court may consider late-filed brief in its discretion).

[9] Effective July 1, 2025, the General Assembly amended the definition of "neglect" found in OCGA § 15-11-2 (48) (A), which now provides that "means" "[t]he failure to provide necessary parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional heath or safety[.]" See Ga. L. 2025, Act 284, § 1.

14

for his or her child." OCGA § 15-11-311 (a) (1) (emphasis supplied). Because the statute is phrased in the disjunctive, a juvenile court's finding that a parent's medically verified deficiency was of such duration or nature as to render the parent unable to meet the needs of the child would support a finding of dependency. See *Mornay v. Nat. Union Fire Ins. Co. of Pittsburgh, P.A.*, 331 Ga. App. 112, 115 (2) (769 SE2d 807) (2015) ("Where a legislative provision is phrased in the disjunctive, it must be so construed absent a clear indication that a disjunctive construction is contrary to the legislative intent.") (citation and punctuation omitted). As noted above, when reviewing a juvenile court's determination that a child is dependent, we are required to defer to the juvenile court's fact finding and credibility determinations, "bearing in mind that the juvenile court's *primary responsibility* is to consider and protect the welfare of [children] whose well-being is threatened." *In the Interest of S. C. S.*, 336 Ga. App. at 244-245 (citation and punctuation omitted; emphasis supplied). With this framework in mind, we conclude that the juvenile court was authorized to find that the mother suffered from a medically verified deficiency of her mental health that was of such a duration and nature as to render her children dependent.

Mother argues that the juvenile court's order is insufficient because the State did not present testimony from a medical professional as to Mother's diagnosis and prognosis. As an initial matter, OCGA § 15-11-311 (a) (1) does not specify any particular type of evidence that is required to support a juvenile court's finding of a medically verified mental health deficiency that renders a parent unable to meet the needs of her children. More importantly, we are unpersuaded that the lack of such testimony in the instant case warrants reversal of the juvenile court's order under the particular circumstances present here. Specifically, evidence adduced at the hearing showed that during the February 2024 incident, Mother rammed her vehicle through a metal gate and beat on an apartment door, demanding to be let in. She then retrieved a firearm, loaded it, led police on a two-to-three mile pursuit, and almost drove her vehicle into Lake Lanier. When the arresting officer asked Mother what was going on, she explained that she was looking for her children. The officer asked her where her children were, and she responded: "with the devil." When asked where the devil was, Mother answered: "Everywhere." The officer confirmed that her behavior was possibly consistent with someone experiencing mental health issues. Mother admitted that a psychologist at a hospital informed her that the February 2024 incident was the

16

result of a manic episode, and the juvenile court was permitted to credit this testimony. Despite the psychologist's diagnosis, Mother insisted that her actions in the February incident were the result of metal left in her mouth following a root canal in 2021.

In addition, as noted by the juvenile court, Mother's mental health issues — which she testified also include blackouts, memory loss, and "brain fog" dating back at least two years — are not being treated because she attributes her psychotic episode to a dental issue and has thus failed to seek treatment. Mother also refused to answer several questions about the February 2024 incident, invoking her Fifth Amendment right against self-incrimination, and "inferences can be drawn from the mother's invocation of her privilege against self-incrimination in a civil action, and such inferences may constitute admissions unfavorable to her." *In the Interest of K. N. C.*, 264 Ga. App. 475, 481-482 (4) (a) (590 SE2d 792) (2003) (citation and punctuation omitted); *In the Interest of R. D.*, 346 Ga. App. 257, 258 n. 2 (816 SE2d 132) (2018).

The facts recited above, including Mother's admitted medical diagnosis, coupled with the extreme nature of the February incident (which included a loaded firearm, a police pursuit, and delusions *directly pertaining to the children*), authorized

17

the juvenile court to find that Mother's mental health deficiency was medically verified and of such duration or nature as would render her unable to provide adequately for her children. Accordingly, the juvenile court's determination that the children are dependent is supported by clear and convincing evidence. See *In the Interest of R. E. M. B.*, 374 Ga. App. 564, 569 (1) (b) (ii) (913 SE2d 425) (2025) (affirming juvenile court's dependency finding based on lack of proper care and control where evidence showed mother suffered from severe mental illness that prevented her from properly caring for minor child, mother was noncompliant with prescription medication regimen, and one symptom of mother's untreated conditions was blackouts during which she had no recollection of events, including episode where mother left child unattended in hot car); *In the Interest of D. H. D.*, 289 Ga. App. 32, 35-36 (656 SE2d 183) (2007) (clear and convincing evidence supported deprivation[10] finding where mother admitted to suffering from schizoaffective disorder which was characterized by delusions and hallucinations, that she ignored the condition, and that she no longer took medication; courts need not wait until child suffers harm before

---

[10] See generally *In the Interest of S. C. S.*, 336 Ga. App. at 244 n. 4 ("Given the similarities between the definition of a 'deprived child' [under the former Juvenile Code] and that of a 'dependent child,' . . . our previous decisions addressing the deprivation of a child are relevant to appeals involving dependency of a child.").

finding child to be deprived); *In the Interest of M. D.*, 283 Ga. App. 805, 807 (642 SE2d 863) (2007) (affirming finding of deprivation based on mother's admission that her psychological disorder led to delusions and hospitalization); *In the Interest of D. D. B.*, 263 Ga. App. 325, 328 (1) (c) (587 SE2d 822) (2003) (explaining that mother's unwillingness to consistently treat her mental health condition may support determination that child's depravation was likely to continue).

Accordingly, the judgment of the juvenile court is affirmed with respect to Mother.

*A25A0351*

2. On appeal, Father asserts numerous enumerations of error, including claims that the juvenile court violated his due process rights, that the evidence fails to support the juvenile court's order, that the juvenile court misconstrued the evidence, that the juvenile court improperly ruled on his motion for directed verdict, and that the juvenile court's order was insufficient. As detailed below, Father has failed to demonstrate error; consequently, we affirm the judgment of the juvenile court with respect to Father.

(a) Father first argues that the juvenile court "violate[d] [his] state and federal constitutional right to due process" by making a "finding of abandonment . . . [where] abandonment was not alleged in the dependency complaint, in the dependency petition, or in the amended dependency petition." This argument is without merit.[11]

OCGA § 15-11-152 provides, in relevant part, that "[a] petition alleging dependency . . . shall set forth plainly and with particularity . . . [t]he facts which bring a child within the jurisdiction of the court." As we have recently explained, "[t]his language, together with the principles of procedural due process, require a dependency petition to set forth the facts supporting the child's alleged dependency so that parents have sufficient information to allow them to prepare a defense." *In the Interest of H.H.*, 347 Ga. App.468, 475 (1) (b) (913 SE2d 107) (2025).

Here, the State complied with this requirement by filing a detailed, two-page dependency petition which included the allegations that Father had "had no contact with the children for over two years" and that there had been "an unsubstantiated allegation of sexual abuse involving Father and [Dy. H.]." While Father contends that

[11] We note that our review of this claim is hampered by Father's failure to cite to meaningful legal authority. Father cites only OCGA § 15-11-152 (1) and OCGA § 15-11-2 (1) in support of this argument; in fact, Father has failed to identify the constitutional rights to due process that he alleges were violated.

this language is "ambiguous" and that abandonment must be considered on a "case-by-case basis," Father cites no authority requiring the State to exhaustively detail the factual underpinnings of such a claim, and Father does not explain how these allegations were insufficient to prepare his defense. Compare *In the Interest of D. R. C.*, 191 Ga. App. 278, 278 (1) (381 SE2d 426) (1989) (denial of due process where the State's dependency petition "failed to provide *any* facts upon which it [was] predicated," but, instead, "merely provide[d] a condensation of the [relevant] statutory provisions") (emphasis supplied). Accordingly, Father has failed to demonstrate error, and he is not entitled to relief on this claim.

(b) Father next argues that, even if abandonment had been properly asserted in the dependency petition, the State failed to satisfy its burden of proof. This argument, too, lacks merit.

We again note that Father's argument is supported by a single citation of authority, namely, a passing reference to the statute defining abandonment. Indeed, although Father asserts that there are "specific elements" that the State had to prove in order to establish abandonment, Father neither identifies nor addresses them; instead, Father simply characterizes the evidence in a light most favorable to him,

claiming that the GAL and Mother were "somewhat duplicitous" in asserting that "he did not want to be the children's father any longer." As explained above, however, this Court defers to the credibility determinations and fact findings of the juvenile court where supported by the record; accordingly, we are not authorized to re-weigh or reconsider the evidence, which is what the Father asks us to do. See, e.g., *In the Interest of S. C. S.*, 336 Ga. App. at 247 (2) ("[W]e emphasize that as an appellate court, we do not decide what weight should be afforded to specific evidence."). Viewed through the appropriate lens, it is clear that the juvenile court's determination in this regard is sound.

"Abandonment . . . means any conduct on the part of a parent . . . showing an intent to forgo parental duties," which may be evidenced by, as relevant here, either the "failure, for a period of at least six months, to communicate meaningfully with the child" or the "failure, for a period of at least six months, to maintain regular visitation with a child." OCGA § 15-11-2 (1) (A) and (B). Here, the evidence presented below demonstrated that Father went extended periods of time — well in excess of six months — without communicating or visiting with the minor children and, further, that Father plainly expressed his desire to cease acting as a Father to the children.

Accordingly, the evidence was sufficient to support the juvenile court's conclusion that Father had abandoned his children, and Father is not entitled to relief on this claim.

(c) Father next argues that "[t]he juvenile court abused its discretion by failing to properly weigh and consider pertinent evidence for establishing abuse or neglect[,] any correlating harm to the children, and parental unfitness." Specifically, Father asserts that the State failed to show that "the allegations contained in its initial [petition] constituted dependency or that there was harm to the children at the time of the filing of the petition." Despite how this argument is framed, Father is not challenging some failure of proof by the State or some error by the juvenile court; instead, he is, again, asking this Court to reconsider and re-weigh the evidence.[12] We

---

[12] Over the course of approximately 12 pages — which amounts to nearly a third of his brief — Father spends considerable effort attacking the juvenile court's findings of fact and re-weighing the evidence. Father first complains that the juvenile court disregarded the positive reports pertaining to his supervised visitation with the children and that the GAL used cross-examination to "distort" the nature of his visits with the children. Likewise, Father contends that he presented "compelling and credible testimony" concerning his sexual misconduct conviction. Next, Father asserts that the video evidence of him striking Dy. H. was an isolated incident, that it did not result to law enforcement being contacted, and that Mother supposedly never testified that she felt the children were in danger with him. Father then turns to the sexual abuse of Dy. H. — which he characterizes as an "unsubstantiated allegation of sexual abuse" — and highlights testimony that, he believes, tends to show that the

reiterate that "[t]his Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met." *In the Interest of W.W.*, 308 Ga. App. 407, 407 (707 SE2d 611) (2011) (citation omitted).

Moreover, the record supports the juvenile court's findings of fact that Father physically and sexually abused Dy. H., that Father intentionally absented himself from the lives of the children, that Father's visitation with the children was frivolous, and that Father's housing and income were unstable. Further, these findings of fact authorized the juvenile court's conclusions of law, namely, that both children are dependent with respect to Father owing to abuse, neglect, and abandonment. See, e.g., *In the Interest of H.B.*, 346 Ga. App. 163, 166 (1) (816 SE2d 313) (2018) (juvenile court authorized to conclude that children were sexually abused even where the children

---

case was "unfounded" and that he was unlikely "to have committed the offenses alleged." As to the juvenile court's conclusion that Father's income and housing were unstable, Father complains that the GAL never "attempted a walk-through of [his] home to even see where [he] lives" and that there is no law suggesting that his living arrangements or income are "automatically insufficient" to support his children; he also claims that there was no evidence "that the children would be unsafe in the home with [him]."

denied the abuse during a forensic interview); *In the Interest of M.M.*, 315 Ga. App. 673, 677 (2) (727 SE2d 279) (2012) (juvenile court authorized to find minor children dependent as to mother where she left the children with father for an extended period of time — without visiting or providing financial support — and where mother lacked appropriate housing and stable employment).

(d) Father's third enumeration of error asserts as follows:

the trial court erred as a matter of law because it failed to conduct the [p]reliminary [p]rotective [h]earing and the [a]djudication [h]earing properly, by conflating evidence and standards of proof, by not issuing a written ruling in Appellant's motion for directed verdict, and by allowing the [State] and the GAL to expand the assertions of dependency during the [hearings] and finding dependency beyond that which were stated in the dependency petition and amended dependency petition.

However, the three-paragraph, stream-of-consciousness argument that accompanies this enumeration bears little resemblance to the enumeration of error itself; further, the argument fails to include any meaningful citation of legal authority.[13] Instead,

---

[13] The Father cites only to OCGA § 15-11-152 (1), which, as explained above, merely provides as follows: "A petition alleging dependency shall be verified . . . and shall set forth plainly and with particularity: (1) The facts which bring a child within the jurisdiction of the court, with a statement that it is in the best interests of the child and the public that the proceeding be brought[.]"

25

Father vaguely argues that the State "failed to establish that there was a safety risk that warranted continued removal for the purposes of the PPH" and that the issues raised in the amended petition — which concerned proof of housing and employment — were "unripe" and "too amorphous to defend against." To the extent that Father has failed to support this compound enumeration of error with specific argument or citation of legal authority, it is deemed waived. See *In the Interest of M.J.G.*, 203 Ga. App. 452, 454 (4) (416 SE2d 796) (1992); Court of Appeals Rule 25 (d) (1). Likewise, to the extent that Father is attempting to expand his enumeration of error through argument in his brief, this, too, is improper. See, e.g., *In the Interest of T.J.*, 281 Ga. App. 308, 314 (2) (636 SE2d 54) (2006).

Finally, even if this Court wished to exercise its discretion to consider this alleged error, Father's argument with respect to this enumeration is inscrutable, and there is no legal authority cited that could assist this Court in gleaning Father's actual contentions. Because it is impossible for this Court to discern the actual substance of Father's arguments or to glean any allegation of possible error, we deem this argument waived, and we do not address it. See *DeKalb County School Dist. v. DeKalb Agriculture Technology and Environment*, 369 Ga. App. 829, 834 (3) (894 SE2d 646) (2023) ("[A]s

we have previously explained, vague assertions of error are not entitled to appellate review because 'it is not this Court's job to cull the record on behalf of Appellant to find alleged errors, as appellate judges are not like pigs, hunting for truffles buried in briefs.'"), overruled on other grounds by *Pollard v. Great Dane*, 371 Ga. App. 872, 876 (2) (a) n.5 (903 SE2d 338) (2024).

> (e) In his final enumeration of error, Father alleges as follows:

> The juvenile court's dependency and adjudication rulings should be reversed because the . . . court's amended order . . . did not state findings of fact or conclusions of law relating to the preliminary protective hearing nor were the findings of fact or conclusions of law sufficient to establish dependency or parental fitness in the adjudication proceeding, hence rendering said [amended order] insufficient on [its] face, and necessitating the vacatur of all subsequent orders.

However, as with his previous enumeration, the argument section accompanying this enumeration of error bears little resemblance to the enumeration of error itself and includes sparse legal authority, if any. Instead, Father asserts that the juvenile court's amended order is legally insufficient in approximately 11 different ways[14] and, further,

---

[14] Father claims that the juvenile court's order (1) fails to "establish[] the initial legal basis for the juvenile court to have subject matter jurisdiction as it relate[s] to the initial probable cause portion of dependency"; (2) "does not state the statutory basis

27

that the juvenile court erred by failing to enter a written order on his motion for directed verdict.[15]

As with his prior enumeration, to the extent that Father has failed to support this compound enumeration of error with specific argument or citation of legal authority, it is deemed waived. See *In the Interest of M.J.G.*, 203 Ga. App. at 454 (4); Court of Appeals Rule 25 (d) (1). Likewise, to the extent that Father is attempting to expand his enumeration of error through argument in his brief, this, too, is improper. See *In the Interest of T.J.*, 281 Ga. App. at 314 (2). Moreover, there is no indication

_____

for how venue is proper in [Gwinnett] County" ; (3) "does not state . . . how [the juvenile court] has jurisdiction to preside over this matter" ; (4) does "not contain the necessary statement of nexuses between the findings of fact and conclusions of law to support its rulings" ; (5) does not include findings pursuant to OCGA § 15-11-146 (a) (1) concerning probable cause of dependency ; (6) does not address OCGA § 15-11-146 (d) concerning reasonable efforts to prevent or eliminate the need for the removal of the child ; (7) does not reference OCGA § 15-11-202 (f) (2) concerning whether the State "made reasonable efforts to finalize an alternative permanent home for the children upon them being adjudicated dependent" ; (8), (9), and (10) does not reference the diligent search provisions of either OCGA § 15-11-211 (a), (c) or (e) ; and (11) does not state the basis for any determination of parental unfitness.

[15] For all that appears, Father is attempting to assert approximately 15 alleged errors in the final six pages of his brief. This "scattershot" approach — which lacks citations to relevant legal authority and includes nothing more than cursory allegations — is not the meaningful argument envisioned by the rules of this Court. See, e.g., *Farmer v. Dept. of Corrections*, 346 Ga. App. 387, 394 (2) (816 SE2d 376) (2018).

that Father raised these arguments below. Consequently, they are deemed abandoned. See *In the Interest of H. B.*, 346 Ga. App. at 172-173 (6) (declining to consider complaint concerning timing of juvenile court's order when it was raised for the first time on appeal).

Nevertheless, out of an abundance of caution, we will broadly address several of Father's arguments. Father initially asserts that the order fails to "establish[] the initial legal basis for the [juvenile] court to have subject matter jurisdiction as it relate[s] to the initial probable cause portion of dependency," that the order fails to state "how venue is proper in [Gwinnett[16]] County," or how the juvenile court had jurisdiction to preside over this matter.[17] However, the juvenile court's amended order references the names and ages of the children, declares that the children reside in Gwinnett County, states that the juvenile court "has subject matter jurisdiction and personal jurisdiction over the children and parents," declares that venue is proper, and reflects that the proceedings stem from "complaints and a dependency petition."

---

[16] Father's brief questions how venue was proper in *Douglas* County; however, the matter was heard in the Juvenile Court of *Gwinnett* County.

[17] We note that these arguments, like many of Father's other arguments, are unsupported by citation of legal authority.

Consequently, the face of the juvenile court's order shows the requisite jurisdictional facts. See, e.g., *In the Interest of H. B.*, 346 Ga. App. at 174 (7).

Father also asserts that the juvenile court "failed to state in its order the basis of any determination of parental unfitness" and that the order does "not contain the necessary statement of nexuses between the findings of fact and conclusions of law to support its rulings." However, as discussed above, the juvenile court entered a detailed, 11-page order including approximately 50 findings of fact and extensive conclusions of law with respect to Father. While the juvenile court may not have tied all of its findings of fact to a conclusion of law, the converse is not true; the juvenile court's conclusions of law are all tied to findings of fact, which, as discussed above, are supported by the clear and convincing evidence. Further, the juvenile court's findings relate both to dependency and unfitness. See *In the Interest of S. C. S.*, 336 Ga. App. at 248-249 (2)-(3) (recognizing that same evidence pertains to dependency can also pertain to whether parent is unfit). Moreover, we are not required to parse the juvenile court's order for thaumaturgic language; instead, "when reviewing a juvenile court's order, we are mindful that such orders are construed according to their substance and function and not merely by nomenclature." *In the Interest of K. R.*, 367

30

Ga. App. 668, 671 (1) (888 SE2d 204) (2023) (affirming sufficiency of juvenile court's dependency order) (citation and punctuation omitted).

Finally, we note that the juvenile court's order expressly declares that the children are dependent as to both parents, plainly reflects that "reasonable efforts" were made "to eliminate the need for removal of the children from the home and to reunify the children with their family at the earliest possible time," specifically notes that returning the children home is contrary to their welfare, and clearly indicates that the State "shall continue reasonable efforts to eliminate the need for placement outside the home." In sum, Father is not entitled to relief as to this enumeration.

For the reasons explained above, the judgment of the juvenile court is affirmed.

*Judgments affirmed in Case Nos. A24A1822 and A25A0351. Barnes, P. J., concurs. Pipkin, J., dissents.*

31

# In the Court of Appeals of Georgia

A24A1822. In the Interest of D. H. et al., CHILDREN (MOTHER).

A25A0351. In the Interest or D. H. et al., CHILDREN (FATHER).

PIPKIN, Judge, dissenting.

While I agree with the majority opinion that the judgment of the juvenile court should be affirmed with respect to Father, I conclude that the juvenile court erred in its application of OCGA § 15-11-311 (a) (1) and, thus, that the judgment of the juvenile court should be reversed with respect to Mother; consequently, I respectfully dissent.

A child is "neglected," as that term is used in our Juvenile Code -- and as relevant here -- where there is a "failure to provide proper parental care or control," OCGA § 15-11-2 (22), and a child may be deemed to be "without proper parental care and control" where there is a "medically verified deficiency of [a parent's] physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child," OCGA § 15-11-311 (a) (1). The question presented in this appeal is whether the facts, as found by the juvenile court, satisfy this standard; while we must afford the juvenile courts (and, more generally, trial courts) the substantial deference to which they are entitled, this appeal requires the application of the juvenile court's findings to the law, which is a legal question. See, e.g., *Garden Club of Georgia v. Shackelford*, 274 Ga. 653, 655 (1) (560 SE2d 522) (2002) (recognizing that, where the question presented involves a "mixed question of law and fact . . . we defer to the trial court's factual findings unless clearly erroneous, but are not bound by its legal conclusions").

Here, even accepting the juvenile court's factual findings, the State presented insufficient evidence to support the juvenile court's legal conclusion with respect to Mother. While the evidence undoubtedly shows that Mother reported some

2

concerning physical ailments -- and while the February 2024 incident is patently disturbing -- nothing presented at trial was *medically verified*, as required by statute. At best, the State presented testimony from lay witnesses concerning Mother's *behavior* and elicited testimony from Mother that *she had been told* by some unnamed and unidentified psychologist that she had suffered a "manic episode." While the majority opinion is correct that OCGA § 15-11-311 (a) (1) does not "specify any particular type of evidence" required to establish such deficiency, it is beyond dispute that any determination of a mental, physical, or emotional deficiency must be *medically verified*; if that phrase is to mean anything, it must mean *something*, and merely highlighting testimony from lay witnesses that paints Mother as mentally ill -- and drawing "inferences" from that testimony -- does not satisfy this standard. In short, OCGA § 15-11-311 (1) has no application here because there was no

> evidence of the mother's present mental impairment. . . . . There is no psychological evaluation included in the record, or reports from treating physicians, or medical reports indicating any mental impairment or how said mental impairment might limit the mother's parental abilities.

*In the Interest of D.W.*, 318 Ga. App. at 730 (3). Indeed,

[t]he mother's own testimony, although troubling, simply does not include the detail necessary to make conclusions about her mental condition, its effect on her parenting skills, or the likelihood that it will continue. Although she clearly has mental problems, the record does not contain sufficient evidence to show the nature of her problems and the prognosis for her future.

*In the Interest of C.C.*, 257 Ga. App. 543, 550 (571 SE2d 537) (2002) (physical precedent only).[1] See also *In the Interest of C.D.E.*, 248 Ga. App. 756, 764-766 (546 SE2d 837) (2001).

Notably, while Mother relies heavily on *In the Interest of D.W.*, *In the Interest of C.C.*, and *In the Interest of C.D.E.*, among others, the majority has wholly failed to address these decisions. Instead, the majority relies on *In the Interest of R.E.M.B.*, 374 Ga. App. 564 (913 SE2d 425) (2025), and *In the Interest of D.D.B.*, 263 Ga. App. 325

---

[1] I recognize that our decisions in *In the Interest of K.S.*, *In the Interest of D.W.*, and *In the Interest of C.C.*, among others, were decided *before* the effective date of the new Evidence Code, at which point "hearsay evidence ha[d] no probative value even when . . . admitted without objection." *In the Interest of C.D.E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001). Compare *In the Interest of R.D.*, 346 Ga. App. 257, 261 (1) n.10 (816 SE2d 132) (2018) (recognizing that, under the new Evidence Code, any unobjected-to hearsay is deemed legal, admissible evidence). Consequently, those decisions are concerned, at least in part, with the competency and admissibility of the second-hand testimony used to establish dependency. That said, I nevertheless find these decisions instructive as to the nature and quality of evidence needed to establish a *medically verified* deficiency of the mother's physical, mental, or emotional health.

(587 SE2d 822) (2003), cases in which the juvenile court was presented with actual evidence of mental illness. The juvenile court in *In the Interest of R.E.M.B.*, was presented with, among other things, a psychological assessment of the mother, 374 Ga. App at 570 (1) (a) (ii), while the juvenile court in *In the Interest of D.D.B.*, heard testimony from a licensed psychologist, 263 Ga. App. at 326. There is no such evidence here. Further, while the majority relies on two related cases -- *In the Interest of D. H. D.* and *In the Interest of M. D.* -- those appeals were decided under the former version of the Juvenile Code and under a completely different statutory provision.[2]

Because the evidence fails to establish that Mother has a *medically verified* mental illness and because the majority opinion has failed to address or consider persuasive precedent, I respectfully dissent.

---

[2] Specifically, those cases involved OCGA § 15-11-2 (8) (A) (2007), which concerned whether a child "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals," as well as case law under the prior statutory scheme applying a different standard, namely, whether there was a showing "tantamount to physical or mental incapacity to care for the child." *In the Interest of U. B.*, 246 Ga. App. 328, 328 (1) (540 SE2d 278) (2000).